IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

EDWARD GRAZIANO,

      Plaintiff

     vs.

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS, LT. DEAL, LT.
HAGGERTY, CERT OFFICERS # 1-6,
BRIAN BYERS, LIBRARIAN CRILEY,
DERECK F. OBERLANDER, SUSAN R.
ADAMS, EARNEST MONGELLUZZO,
LISA REEHER, THERESA BIEL, ANGEL
F. GRESSEL, BRUCE SIMONS, RICHARD
CAMACHO, KIMBERLY SMITH, KEVIN
COWAN, ANDREW LESLIE, YVETTE
PERRIN, GREGORY MILLER,
MICHELLE CROWTHER, LISA FISCUS,
LT. BOGARDUS, CO 1 MORGAN, CO 1
MINICH, CO 1 WITNESS OF DC-141,
PART D2, LT. DICKEY, ERIN MILLER,
ROSS MILLER, CENTURION,
WELLPATH, and IAN GUSSTAFSON,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**1:22-CV-00163-RAL**

RICHARD A. LANZILLO
Chief United States Magistrate Judge

**MEMORANDUM OPINION ON
DEFENDANTS' MOTIONS TO
DISMISS**

**ECF NOS.** 60, 70

## I.    Introduction and Procedural History

Plaintiff Edward Graziano ("Graziano"), a prisoner in the custody of the Pennsylvania

Department of Corrections ("DOC"), brings this *pro se* action against the DOC, fifteen named

DOC employees, seven DOC employees identified as "John Doe" Defendants (collectively,

"DOC Defendants"),[1] two private companies contracted to provide medical services to DOC

---

[1] All individual DOC Defendants except two are employed at the DOC's State Correctional Institution at Forest
("SCI-Forest"), where Graziano was previously incarcerated. They are: Superintendent Oberlander, Deputy
Superintendent for Centralized Services ("DSCS") Adams, Deputy Superintendent for Facilities Management
("DCFS") Mongelluzzo, Facility Grievance Coordinator/Corrections Superintendent Assistant ("CSA") Reeher,
Administrative Officer ("A/O") Biel, Licensed Psychology Manager ("LPM") Simons, Corrections Health Care
Administrator ("CHCA") Smith, Psychology Service Specialist ("PSS") Cowan, Corrections Classification and

inmates (Centurion and Wellpath), three Centurion employees, and one Wellpath employee.[2]
*See* ECF 11.   Graziano's twenty-two-count, 510-paragraph Complaint asserts seventeen claims
pursuant to 42 U.S.C. § 1983 for violations of his rights under the First, Fourth, Eighth, and
Fourteenth Amendments to the United States Constitution, a claim under Title II of the
Americans with Disabilities Act, 42 U.S.C. § 12132, and four claims under Pennsylvania state
tort law.   Graziano seeks compensatory and punitive damages as well as declaratory and
injunctive relief.  All individual Defendants are sued in their individual and official capacities.

The DOC Defendants have moved to dismiss certain of Graziano's claims pursuant to
Fed. R. Civ. P. 12(b)(6), ECF Nos. 60, 61, and Centurion and its three employees, CRNP
Gressel, CRNP Byers, and Dr. Camacho, (collectively, "Centurion Defendants") have moved to
dismiss all claims against them pursuant to Rule 12(b)(6).  ECF Nos. 70, 71.  Graziano has filed
a single brief in opposition to the pending motions to dismiss, and Centurion responded with a
reply brief.  ECF Nos. 99, 100.  The Court has also exercised its obligation to screen certain
other claims for possible dismissal pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A.
The matter is ripe for disposition.[3]

---

Program Manager ("CCPM") Gustafson, Unit Manager ("UM") Perrin, UM Miller, UM Crowther, Hearing
Examiner ("Hex") Fiscus, Lieutenant ("Lt.") Bogardus, Corrections Officer 1 ("CO1") Morgan, and CO1 Minich.
The Complaint also refers to one of the DOC Defendants as "CO1 Witness of DC-141, Part 2D".  ECF No. 11, ¶ 30.
*See id.*, ¶¶ 10-15, 17, 19, 20, 21, 23-29.  The remaining individual DOC Defendants are employed at SCI-Camp
Hill: Lt. Dickey, Corrections Counselor ("CC") Miller, and UM R. Miller.  *See* ECF No. 11, ¶¶ 31-33.

[2] The Centurion employees are Certified Registered Nurse Practitioner ("CRNP") Gressel, CRNP Byers, and Dr.
Camacho; and the Wellpath employee is Nurse Practitioner ("NP") Leslie.  *See* ECF No. 11, ¶¶ 16, 18, 22.

[3] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and it can exercise supplemental
jurisdiction over the state-law claims under 28 U.S.C. § 1337.  The parties have consented to the jurisdiction of a
United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as
authorized by 28 U.S.C. § 636.

## II.   Standard of Review

### A. Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a Rule 12(b)(6) motion to dismiss, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  The "court[] generally consider[s] only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" when considering the motion to dismiss.[4] *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

In making its determination under Rule 12(b)(6), the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and

---

[4] Graziano's Complaint includes an appendix with the following exhibits: medical records from SCI-Forest and SCI-Camp Hill (ECF No. 15, pp. 1-7, 12-17); 07.24.2020 Inmate request to Staff Member (*id.*, p. 8); Gressel's license (*id.*, p. 9); 02.28.2021 Inmate Request to Staff Member (*id.*, p. 10); Policy Procedure Waiver Request (*id.*, p. 11); Inmate Disability Accommodation Request Form (*id.*, p. 18); 07.23.2019 Inmate Request to Staff Form (*id.*, p. 19); Inmate Disability Accommodations Request response (*id.*, pp. 20-21); Misconduct D485643 documents (*id.*, pp. 22, 24-28, 37-38, 41-45, 73); Unsworn Affidavit of John Fran (*id.*, p. 23); Misconduct D485608 documents (*id.*, pp. 29-35, 46); 01.15.2021 Inmate Requests to Staff Member (*id.*, p. 36); 01.08.2021 Inmate request to Staff Member (*id.*, p. 39, 40); Misconduct D485627 documents (*id.*, pp. 47-57); Misconduct D485626 documents (*id.*, p. 58-62); Grievance 905968 documents (*id.*, pp. 62-76); emails and letters (*id.*, pp. 77-84, 86, 87); 03.19.21 Inmate Request to Staff Member (*id.*, p. 85); Grievance 920153 documents (*id.*, pp. 89-94); Grievance 920454 (*id.*, pp. 95-100); Grievance Restriction documents (*id.*, pp. 101-104); sick call slips (*id.*, pp. 105-08); 06.22.2021 Inmate Request to Staff Member (*id.*, p. 109); Grievance 933165 documents (*id.*, pp. 111-113); Grievance 934135 (*id.*, pp. 114-115); 06.20.2021 Inmate Requests to Staff Member (*id.*, pp. 116-123); Personal Property Inventory (*id.*, p. 124); 07.13.2021 Inmate Request to Staff Member (*id.*, p. 125); package slips (*id.*, pp. 126-28); Grievance 938764 documents (*id.*, pp. 130-134); Grievance 945565 documents (*id.*, pp. 135-136); 10.21.2021 Inmate Requests to Staff Member (*id.*, pp. 137-139); Grievance 953430 documents (*id.*, pp. 141-46, 150-51); and Confiscated Items Receipts (*id.*, pp. 147-48).

Procedure § 1216, pp. 235-36 (3d ed. 2004)).  *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Furthermore, a complaint should only be dismissed pursuant to Rule 12(b)(6) if it fails to allege

"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570

(rejecting the traditional Rule 12(b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78

(1957)).

While a complaint does not need detailed factual allegations to survive a motion to

dismiss, a complaint must provide more than labels and conclusions.  *See Twombly*, 550 U.S. at

555.  A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing

*Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Moreover, a court need not accept inferences

drawn by a plaintiff if they are unsupported by the facts as explained in the complaint.  *See*

*California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the court accept

legal conclusions disguised as factual allegations.  *See Twombly*, 550 U.S. at 555; *McTernan v.*

*City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Finally, because Graziano is proceeding pro se, the allegations in the complaint must be

held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*,

404 U.S. 519, 520-521 (1972).  If the court can reasonably read a pro se litigant's pleadings to

state a valid claim upon which relief could be granted, it should do so despite the litigant's

failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence

construction, or unfamiliarity with pleading requirements.  *See Boag v. MacDougall*, 454 U.S.

364 (1982); *United States ex rel. Montgomery v. Bierley*, 141 F.2d 552, 555 (3d Cir. 1969)

(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance").

### B. 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)

Claims in this action are also "subject to *sua sponte* screening for dismissal pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A because [Graziano] is a prisoner proceeding pro se and is seeking redress from a governmental employee or entity." *Sanchez*, 2014 WL 7392400, at *4 (W.D. Pa. Dec. 11, 2014) (citing *Stackhouse v. Crocker*, 266 Fed. Appx. 189, 190 (3d Cir. 2008). *See* ECF No. 2. The Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, §§ 801–810, 110 Stat. 1321–66 to 1321–77 (April 26, 1996), requires a district court to assess a civil complaint in which a prisoner proceeds *in forma pauperis* (28 U.S.C. § 1915(e)(2)) or seeks redress against a governmental employee or entity (28 U.S.C. § 1915A). *See e.g.*, *Sanchez v. Coleman*, 2014 WL 7392400, at *4 (W.D. Pa. Dec. 11, 2014); *Hill v. Carpenter*, 2011 WL 8899478, at *2 (M.D. Pa. Aug. 3, 2011), *report and recommendation adopted*, 2012 WL 3779364 (M.D. Pa. Aug. 30, 2012) (citing 28 U.S.C. § 1915(e)(2)(B)(ii) ("This Court has a statutory obligation to conduct a preliminary review of pro se complaints brought by plaintiffs given leave to proceed in forma pauperis in cases which seek redress against government officials."). Among other things, that statute requires the Court to dismiss any action in which the Court determines that the action is "frivolous or malicious; fails to state a claim upon which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2); *Muchler v. Greenwald*, 624 Fed. Appx. 794, 796-97 (3d Cir. 2015). A frivolous complaint is one which is either based upon an indisputably meritless legal theory (such as when a defendant enjoys immunity from suit) or based upon factual contentions which are clearly baseless (such as when the factual scenario described is fanciful or delusional).

*Neitzke v. Williams*, 490 U.S. 319, 327 (1989).  The determination as to whether a complaint fails to state a claim upon which relief may be granted is governed by the same standard applicable to motions to dismiss under Rule 12(b)(6).  *D'Agostino v. CECOM RDEC*, 436 Fed. Appx. 70, 72 (3d Cir. 2011) (citing *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999)).

## III.     Factual Allegations

The factual allegations of the Complaint span a period of approximately three years and four months and challenge frequently unrelated conduct of numerous prison personnel at multiple correctional institutions.  These allegations are accepted as true for purposes of the pending motions to dismiss.  The Complaint organizes these allegations into nine categories: (A) Deprivation of Basic Human Needs (*see* ECF No. 11, ¶¶ 47- 113); (B) Civil Conspiracy (*see id.*, ¶¶ 114-195); (C) Excessive Use of Force/Assault & Battery (*see id.*, ¶¶ 196-223); (D) Denial of ADA Assessment & ADA Accommodations (*see id.*, ¶¶ 224-244); (E) Due Process, Retaliation, and False Imprisonment (*see id.*, ¶¶ 245-329); (F) Retaliation by Restriction of Prisoner/Visitor's Telephone and Visiting Privileges (*see id.*, ¶¶ 330-343); (G) Retaliation by Way of Grievance Restriction (*see id.*, ¶¶ 344-349); (H) Sexual Harassment/Denial of Medical Care and Violation of Medical Privacy and Confidentiality (*see id.*, ¶¶ 350-366); and (I) Conspiracy/Retaliatory Interference with Court Access by Confiscation and Destruction of Legal Property (*see id.*, ¶¶ 367-417).

### A.  Asserted Deprivations of Basic Human Needs

Graziano has been diagnosed with several mental health ("MH") disorders and, at all relevant times, has been classified as a "C Roster" "on the active Mental Health/Intellectual Disability (MH/ID) Roster...."  ECF No 11, ¶ 39.  DOC healthcare providers have treated

Graziano's anxiety and depression for approximately fifteen years, and his "psychiatric care has consisted of antidepressant medications," including Remeron and Cymbalta. *Id.*, ¶ 43.

On January 24, 2019, he was transferred from SCI-Albion to SCI-Forest. Approximately two weeks after Graziano's arrival at SCI-Forest, his "antidepressants, namely Remeron (mirtazapine) and Cymbalta (duloxetine), stopped working for him" because prison personnel administered the medication during the last medication line/medline between 3:30 and 4:30 pm each day rather than at bedtime as prescribed. *Id.*, ¶ 49. Graziano complained to prison officials that he needed to take his medication at bedtime, but Defendants Smith, Adams, Mongelluzzo, and Oberlander refused to move the evening medication line to a later time. *Id.* The earlier medication intake exacerbated Graziano's anxiety and depressive disorders. *Id.*, ¶ 50.

Graziano also alleges that his mental health further deteriorated because of excessive noise and light at the prison. Specifically, he complains that SCI-Forest "blared" between 150 and 200 "line movements and unit announcements…through cell intercom speakers daily from" 6:00 am to 9:00 pm, and that its inmate count procedure caused "bright cell count lights" to "stay on from" 10:15 to 10:50 pm, 2:00 to 2:35 am, and 3:00 to 3:35 am "day in and day out." *Id.*, ¶ 54. "Without success," Graziano sought relief from "his Psychiatric Review Team (PRT),[5] Unit Management Team (UMT),[6] and Administration staff" by communicating his distress "through direct communication, Inmate Request[s] to Staff and Inmate Grievance[s]." *Id.*, ¶ 68. Graziano also "met with psychology staff virtually every 30 days, and psychiatric staff virtually every 90 days in accordance with DOC Policy." *Id.*, ¶ 72. Additionally, he also was seen ten times "during

---

[5] The PRT included Simons, Byers, Smith, Camacho, and UM Miller.

[6] From May 2019 to August 2020, the UMT included Connors and UM Miller, and from August 3, 2020 to July 1, 2021, the UMT included Crowther, Morgan, Perrin, and Cowan.

January and July, 2019" by the PRT.  *Id.*, ¶ 73.  At each meeting with the PRT, Graziano reiterated his concerns.  "PRT, however, took no remedial action."  *Id.*

On July 18, 2019, Graziano "met with PRT to go over his new Individual Recovery Plan ('IRP')".  *Id.*, ¶ 74.  The IRP consisted of the following four goals: "(1) Recovery from Depressive Disorder; (2) Recovery from Anxiety Disorder; (3) Trauma; (4) Sleep and (5) Medication Management."  *Id.*, ¶ 74.  Defendants Simons, Byers, Camacho, Miller, Smith "and other staff at SCI Forest . . . rendered that plan virtually impossible" because they "continued to routinely tell [him] that there was nothing they could do to ensure he received his psychiatric medication at bedtime as prescribed or mitigate his torturous living conditions."  *Id.*, ¶ 75.

Graziano later "discovered that the Special Needs Unit (SNU) at SCI-Forest had a special medication line" at approximately 7:30 pm.  *Id.*, ¶ 76.  But Simons, Connors, Byers, Dr. Camacho, and others denied Graziano's request for admittance into this unit because they claimed he "did not meet the criteria."  *Id.*, ¶ 77.  Graziano complained of this denial in a November 26, 2019 grievance, which UM Miller denied and, upon appeal, Oberlander upheld.  *Id.*, ¶¶ 78-81.

"On February 26, 2020, [Graziano] told CRNP Byers during a routine psychiatric appointment, that he was having thoughts of suicide because his issues were being disregarded."  *Id.*, ¶ 84.  No remedial action was taken.  On April 2, 2020, Graziano relayed his suicidal ideations to Simons, Hartzel, and Gressel.  Simons informed Graziano that they could not change his medication line or the institution's operations, but "that PRT would refer him to the Program Review Committee" to see what they could do.  *Id.*, ¶ 86.  However, several weeks later, Graziano received notice from Connors that Adams had denied his referral because it was unnecessary at that time.  *Id.*, ¶ 87.  Graziano challenged this denial in a grievance, which Simons subsequently denied.  *Id.*, ¶¶ 88-89.

Graziano related his suicidal ideations and depression to "Connors during a routine appointment" on April 3, 2020. *Id.*, ¶ 90. "Immediately PSA Connors notified LPM Simons of [Graziano's] suicidal state and urged LPM Simons to notify Dr. Camacho." *Id.*, ¶ 92. Simons then called Camacho and asked him to speak with Graziano over the speakerphone. Graziano "down-played his suicidal state" on the phone "in order to avoid" being placed in a psychiatric observation cell ("POC"), which Camacho was considering. *Id.*, ¶ 93. Dr. Camacho then told Graziano that "there was nothing he could do at the present time about changing [his] living conditions because facility transfers were on hold due to the COVID-19 pandemic," but he did increase the dosage of Graziano's anti-depression and anxiety medications and promised Graziano he would follow-up with him in-person shortly for a MH evaluation. *Id.*

Graziano sent Connors an Inmate Request to Staff Member Form a few weeks later, informing him that his medication increase was not working and asking for the date of his next in-person appointment with Dr. Camacho. In response, Conners told him that in-person meetings with psychiatric providers were limited because of COVID-19, and a date for the in-person evaluation would be set in due time. Graziano's June 3, 2020, follow-up appointment with Dr. Camacho was subsequently "canceled for untold reasons." *Id.*, ¶ 97.

On June 8, 2020, Graziano complained to Adams that SCI-Forest's announcement, inmate count, and medication line time procedures were harming his mental health. Adams responded by telling Graziano that the facility was not going to alter its operations. About a month later, Graziano "again stressed to PSA Connors that his medication was not working and requested to see CRNP Byers, the on-site psychiatric provider, for a medication change or adjustment because his pending appointment with Dr. Camacho" still had not been re-scheduled. *Id.*, ¶ 100. Connors told him that because Byers was not available, he would refer him to Gressel, the on-site

psychiatric provider for the Restrictive Housing Unit ("RHU"), and "emphasiz[ed] that [Graziano] 'would benefit from an in-person medication follow-up rather than tele-med services." *Id.*, ¶ 101. Graziano did not end up meeting with Gressel because Gressel only changed medication via tele-med, and Graziano made clear that he would only meet with Gressel in person.

Thereafter, Graziano declined the follow-up appointment scheduled with Dr. Camacho for July 24, 2020, because it too would have been conducted via tele-med.

On July 27, 2020, a corrections counselor informed Graziano that Miller had "directed him to not bother helping [Graziano] look into a MH related transfer because [Graziano] did not meet the criteria," even though determining an MH related transfer did not fall within Miller's purview. *Id.*, ¶ 109. Miller then transferred Graziano to a different housing unit.

### B. Asserted Civil Conspiracy

On August 5, 2020, Smith informed Graziano "that going forward, he will be seen by psychiatry via tele-med only and warned him that if he refused another tele-med appointment, he would be taken off psychiatric care." *Id.*, ¶ 117. Graziano replied that he would not genuinely and completely disclose his struggles "through such an impersonal and seemingly public forum." *Id.*, ¶ 118. "From at least July, 2020 thru April 2021, SCI Forest did not have an 'on-site' psychiatric provider assigned to general population." *Id.*, ¶ 120. Further, Gressel, the sole on-site psychiatric provider, only treated RHU inmates and did not get licensed to prescribe medication until January 26, 2021. *Id.*

Graziano attended his next appointment with Camacho on August 11, 2020, via tele-med. He attended this appointment, as did Security at "the Administration['s]" behest. *Id.*, ¶ 130. Because of his public surroundings, however, Graziano did not truthfully and completely divulge his mental health situation. Graziano grieved his issues with virtual therapy. Reeher denied the

grievance, and in her Initial Review Response ("IRR"), she described Graziano's conduct during the appointment as aggressive.

On September 15, 2020, Graziano again met with Dr. Camacho over tele-med. Again, his perception of the public-nature of tele-med prompted him not to discuss all his mental health struggles. At this appointment, Dr. Camacho told Graziano "that he had recommended him for a facility transfer . . . but 'the Administration' denied it.'" *Id.*, ¶ 140. Camacho also ordered an increase in Graziano's Remeron and Cymbalta dosage to fifteen milligrams above the 45 mg recommended dose. "According to clinical studies," taking more than the recommended amount of Remeron and Cymbalta can cause "[t]rouble sleeping, panic attacks, irritation, agitation, aggression, impulses, suicidal thoughts, dissinness [sic], drowsiness, and thinking and reaction impairment." *Id.*, ¶ 142. Graziano suffered from each of these side effects, as well many other medical and mental health issues. Nevertheless, Defendants decided "to wean [him] off the medication . . . and remove[] his diagnosis of 'persistent depressive disorder' in pursuit and furtherance of their plan" to take him off this medication. *Id.*, ¶ 144.

On January 5, 2021, Graziano met with Gressel and Simmons in person for about ten minutes. Graziano told Gressel that his medication was not working because he was receiving it too early. Gressel told him about other psychiatric medications he could try that did not need to be taken at bedtime. Gressel told Graziano that, in order to switch his medication, "she had to first taper him off his current medication." *Id.*, ¶ 147. Graziano agreed to try the other medication, and a follow-up appointment was set for sixty days later. On January 11, 2021, Gressel removed Graziano's diagnosis of "persistent depressive disorder." *Id.*, ¶ 150.

On January 8, 2021, Graziano was placed in the RHU "per orders of Hearing Examiner Lisa Fiscus for a misconduct charge [he] had already been exonerated of on December 31, 2020."

*Id.*, ¶ 148.  Graziano spent forty-five days in the RHU, during which Gressel "urgently attempted to meet with him repeatedly much earlier than their agreed upon 60 day follow-up which was due on or about March 7, 2021."  *Id.*, ¶ 155.  Specifically, Gressel attempted to meet five times. Graziano refused each time "out of mistrust, suspicion and fear that CRNP Gressel was acting in bad faith and trying to cause him harm and even expose him to Covid-19."  *Id.*, ¶ 158.

The tapering of Graziano's psychiatric medication finished on February 2, 2021.  Nine days later, Leslie prescribed him Cymbalta 30 mg after examining him for headaches, eye pain, and the joint/muscle pain he had complained of in a sick-call slip.  The next day, Graziano alerted Leslie, Gressel, and Smith that Cymbalta directly conflicted with his psychiatric care.  He then asked for "a different pain medication that would not interfere" with his mental health treatment. *Id.*, ¶ 161.  By the end of the month, he still had not received new psychiatric medication, so he sent Gressel and Simons an Inmate Request "pleading for psychiatry to get him started on new psychiatric medication."  *Id.*, ¶ 163.  CHCA Smith responded on March 2, 2021.  She explained that "[n]ew psychiatric meds are not being ordered at this time because the psychiatric providers have determined you have no mental health diagnosis that indicates a need for meds.  You can follow up with the psychiatric team during PRT."  *Id.*, ¶ 164.

The next day, Graziano was placed in the RHU under administrative custody ("AC") because of safety concerns for his life.  Graziano's mental health further deteriorated throughout his time in the RHU.  He grieved his worsening mental health on March 4, 2021.  *Id.*, ¶ 12.

On March 9, 2021, Gressel prescribed Graziano a new medication to assist with his sleep and anxiety (Vistaril/Hydroxine 50 mg) but refused to prescribe treatment for his depression.  *Id.*, ¶ 171.

On April 16, 2021, PSS Cowan conducted a one-hour, in-person, out-of-cell therapy session with Graziano. "During that psychology session, PSS Cowan disclosed to [Graziano] 'off the record without mentioning names' that his superiors and colleagues were conspiring against [him] to undermine his MH claims because [his] complaints and threats to sue staff had brought them 'scrutiny' by Central Office and 'a lot of extra work.'" *Id.*, ¶ 176. Cowan also told Graziano that his mental health had been manipulated to "portray[] him as a problematic inmate who poses a threat to staff." *Id.*, ¶ 176. Cowan then informed Graziano that he would lose his job if he did not "follow their 'script'" and "back them up," but "counseled [Graziano] on how to proceed with MH staff at his next facility to get them to be more sympathetic to his MH needs." *Id.*, ¶ 176.

"While in the RHU, [Graziano] persistently complained to and begged" Cowan, Simons, Gressel, Dougherty "and others for psychiatric care" and "to medical staff for medical care for his related physiological symptoms." *Id.*, ¶ 186. On June 21, 2021, Graziano met in-person with Dr. Max Gottesman, his treating psychiatric provider from his prior incarceration at SCI-Albion and the doctor who first diagnosed him with depressive disorder. Gottesman maintained Graziano's prescription for Vistaril and reinstated 30 mg of Remeron, but he did not reinstate his depression diagnosis. *Id.*, ¶ 188.

On July 1, 2021, Graziano was transferred from the RHU at SCI-Forest to the RHU at SCI-Camp Hill. *Id.*, ¶ 190. He was released into SCI-Camp Hill's general population on July 12, 2021. *Id.* On July 21, 2021, SCI-Camp Hill personnel discontinued his Vistaril due to adverse side effects. *Id.*, ¶ 189 n.17. A CRNP there diagnosed Graziano with "Adjustment Disorders with Mixed Anxiety and Depressive Mood," as well as "Antisocial Personality Disorder." *Id.*, ¶ 190. She also prescribed him Remeron, which he first received at bedtime. Soon after, SCI-Camp Hill

personnel began administering the medication between 5:30 pm and 6:00 pm, "which is too early." *Id.*, ¶ 191.

"On January 28, 2022, [Graziano] agreed to a new MH treatment plan," "with [Graziano's] input." *Id.*, ¶ 193.  Nevertheless, Graziano believes "the goals set forth in [his] MH treatment plan . . . are virtually unattainable . . . because no MH related groups are being made available to him and he cannot remain medication compliant because his medication is not being administered at 'bedtime' as prescribed." *Id.*, ¶ 194.  Consequently, Graziano continues to struggle with numerous mental health issues.

### C.  Asserted Excessive Force/Assault and Battery

On April 17, 2021, while Graziano was incarcerated at SCI-Forest, prison personnel placed him in a POC for twenty-four hours because of the suicidal ideations he had relayed to medical staff.  The next day, Byers evaluated his mental health.  Graziano informed Byers that his thoughts of self-harm continued, as did the detrimental mental health effects of SCI-Forest's inmate count, announcements, and medication time procedures.  Later that day, Graziano told Byers, Simons, and Adams that he "would likely attempt to harm himself if left unattended." *Id.*, ¶ 199.

That evening, Graziano "[s]tood on the tabletop of his desk surveying whether he could successfully kill himself if he dove off from its height." *Id.*, ¶ 201.  At that moment, Haggerty approached and asked him what he was doing.  Graziano "answered him frankly and asked to talk with someone from psychology." *Id.*, ¶ 202.  Haggerty responded that they had left and Graziano was being moved to the RHU.  Graziano then "threatened Lt. Haggerty that he would dive off the table if anyone tried to move him to the RHU." *Id.*, ¶ 204.  "Haggerty retorted, 'We'll see about that', and stormed off." *Id.*

Shortly thereafter, Deal approached Graziano's cell with "six (6) Corrections Emergency Response Team (CERT) members, who were wearing riot helmets, gas masks and jackets, and carrying shields, batons and a tear gas (Oleoresin Capsicum (OC)) dispenser (hereinafter 'pepper spray')." *Id.*, ¶ 206. Graziano "was still standing on his desk when they arrived . . . Then suddenly, he was pepper sprayed multiple times . . . in the face and chest and" the pepper spray "got into his eyes and lungs," which "caused [him] excruciating eye pain, temporary blindness and respiratory impairment because it aggravated his asthma." *Id.*, ¶¶ 207-210. Graziano "suffered from chronic asthma" and "was prescribed aerosol inhalers Xopenex HFA (levalbuterol tartrate) and Alvesco (ciclesonide)." *Id.*, ¶ 211.

The CERT officers handcuffed and shackled Graziano before taking him to the infirmary, where medical staff treated his exposure to pepper spray. *Id.*, ¶ 212. The officers then placed Graziano in an RHU cell and began removing his handcuffs. "As the officer to [Graziano's] right fiddle[d] with the handcuffs and the middle positioned officer restrained him with a tether clamped to the handcuffs, the officer to his left bashed his right hand multiple times with the aperture security slider (made out of metal with sharp edges)." *Id.*, ¶ 213. Consequently, Graziano "suffered lacerations on his fingers . . . including bruising and swelling and pulsing pain which grew more intense once the pepper spray he was covered with spread into his wounds." *Id.*, ¶ 214. "During these events, [Graziano] did not resist or threaten the officers in any fashion or break any prison rules." *Id.*, ¶ 219. The CERT Officers then exited the "cold RHU cell," and left Graziano "without a mattress, bed-sheets, blanket, towel, toiletries or clothing except the suicide smock he wore in POC which was soaked with pepper spray." *Id.*, ¶ 215.

Thereafter, Graziano requested medical assistance. RN Hill responded. She allowed Graziano to "use his asthma inhalers and took pictures of his hand injury," but "refused to dress

or treat his hand wounds and exposure to pepper spray or provide any pain medication." *Id.*, ¶ 217.
Ultimately, Graziano "spent approximately fifteen (15) hrs. in distress and pain without sleep
shivering from the cold cell temperatures with nothing to keep warm." *Id.*, ¶ 218.

The next day, April 19, 2019, Graziano reported the previous day's incidents to
Superintendent Oberlander.  Oberlander said to Graziano in response: "Welcome to SCI Forest
Mr. Graziano. You can thank Deputy Superintendent Ennis … for our hospitality . . . you
remember Deputy Ennis Don't you Mr. Graziano? By the way, he wishes you luck with your
lawsuit." *Id.*, ¶ 221.   Graziano had initiated a civil suit against Mr. Ennis in January, 2019.  *Id.*
Following this interaction, Graziano received stitches for his fingers. *Id.*, ¶ 222. Graziano grieved
the pepper spray and subsequent assault on April 22, 2019.  Dickey investigated the grievance and
denied it.  Oberlander upheld his denial, and Final Review upheld Oberlander's decision.

### D.  Asserted Denial of ADA Assessment & ADA Accommodations

In June of 2019, Graziano's mental health "disabilities caused him to regularly miss
meals," "self-isolate in the cell[,] and avoid interacting with others" and prevented him from
"participating in recreational activities," "staying medication compliant," "engaging in pro-social
communication and rapport building with correctional staff," and "achieving any of the treatment
goals set forth in his MH treatment plan"; and "subjected him to disciplinary action and negative
housing restrictions." *Id.*, ¶¶ 237, 239, 238, 241, 242, 243, 240.  On June 30th, Graziano submitted
to CHCA Smith an "Inmate Disability Accommodation Request Form" "seeking accommodations
from the . . . early medline, protractive cell lighting & constant cell intercom announcements."
Graziano claimed that these procedures "substantially limited him from major life activities such
as sleep ([Graziano] stayed awake for 3 to 4 days at a time), interacting with others, reading,
concentrating, working and maintaining schedules, regimens and appointments among other major

life activities." *Id.*, ¶¶ 226, 225.  Additionally, Graziano's daily exhaustion caused him to drop out of a reading class and an anger management self-help class.

Smith reviewed the ADA request per DOC policy, but, contrary to policy, "failed to interview [him] regarding his ADA request or clinically assess the severity of his sleep deprivation." *Id.*, ¶ 228.   On August 23, 2019, Smith told Graziano that she had processed his request and sent it to the Central Office Disability Committee "for their review." *Id.*, ¶ 229.  She further stated that his "request for accommodation is not supported at local level but the disability committee makes final determination." *Id.* On October 7, 2019, the committee denied Graziano's ADA request.  Oberlander informed Graziano of this denial a month later.

### E.  Asserted Due Process Retaliation/False Imprisonment

Over Graziano's objections, in January 2019, he was moved to a unit within SCI-Forest that followed a voluntary disciplinary scheme called "Swift, Certain and Fair" (SCF). *Id.*, ¶ 246. Afterwards, he complained to Simons, Hartzel, Crissman, Brugamin, Cummins, Miller, Sibble, and others "that his worsening preexisting conditions of anxiety, depression and insomnia" due to the prison's lighting and announcement procedures "were impairing his ability to comply with all standing counts." *Id.*, ¶ 250.  Nevertheless, officers charged Graziano with a failure to stand on two separate occasions under the SCF system.  Graziano "refused to accept the Level 1 and 2 sanctions he was offered in each case, and as a result both infractions were respectively referred to Level 3 disposition via misconducts nos. D041270 and D041275 before hearing examiner Lisa Fiscus." *Id.*, ¶ 252.  Fiscus found Graziano guilty "and sentenced him to 15 and 30 days of cell restriction." *Id.*  Graziano grieved his involuntary placement in the SCF unit and consequential misconducts in Grievance No. 796875.  Biel rejected this grievance. *Id.*, ¶ 254.

As discussed above, Graziano was placed in the POC on April 17, 2019, and then the RHU, before being released to general population on May 30, 2019. Upon his release, he was placed in a non-SCF unit. Thereafter, Graziano learned that the DOC intended to expand the SCF program. In August 2019, Graziano filed suit against the DOC challenging the legality of this program. *Id.*, ¶ 258.

About a year later, Graziano was moved to a unit that adhered to the SCF system. Graziano objected to UM Miller about the move and program. In response, UM Miller told him that his failure to comply would result in his placement in the RHU. While Graziano grudgingly moved to the new unit, he refused to sign the SCF participation form because of his lawsuit challenging the program's legality. Morgan informed him that inmates must comply with the SCF system regardless of whether they signed the form. Two days later, on August 5, 2020, Graziano filed a grievance alleging that he had been moved to this unit in retaliation for his lawsuit about the SCF program. *Id.*, ¶ 267.

About four months later, Morgan issued Graziano a "Swift (SCF) for loaning or borrowing property." *Id.*, ¶ 268. Graziano declined to accept this Swift on the grounds that "he was not a SCF Participant and was not taking a Swift based on trumped-up charges." *Id.*, ¶ 269. About two hours later, Morgan issued Graziano Misconduct No. D485643 charging him with the same. Crowther attempted to discipline Graziano according to the SCF scheme for a level 2 disposition, but Graziano refused to comply with the procedure. *Id.*, ¶ 273. Graziano also presented Crowther with "an Unsworn Affidavit from inmate John Fran # LD4839, which vindicated [Graziano] of the charge of loaning or borrowing property." *Id.* Crowther reviewed the affidavit and then "refer[ed] the misconduct to the hearing examiner for a Level 3 disposition" because of Graziano's non-compliance with SCF. *Id.*, ¶ 274.

On December 22, 2020, Fiscus presided over the misconduct hearing for Misconduct No. D485643. Graziano immediately informed Fiscus that he had not received the required pre-hearing psychological evaluation and then requested this exam. Fiscus informed him that she had a form from Simons representing that Graziano had in fact received this exam. Fiscus proceeded to hold the misconduct hearing. At this hearing, Graziano pled not guilty. Fiscus then placed Graziano in a holding cell in order to conduct another hearing. *Id.*, ¶ 283.

Hearing Examiner Dupont continued Graziano's hearing by video on December 29, 2020. Dupont dismissed the charge without prejudice. Later that day, "Morgan recharged [Graziano] with loaning or borrowing property via misconduct # D485608." *Id.*, ¶ 288. Dupont also conducted the hearing on misconduct # D485608, found Graziano innocent, and dismissed this charge with prejudice.

Ten days later, "CO1 Domies told [Graziano], via cell intercom, that he had a misconduct hearing that morning and directed him to pack-up his personal property and stand-by for his hearing," even though Graziano had not received another misconduct. *Id.*, ¶ 295. Before exiting the cell, Domies asked Graziano to sign his property sheet, which declared that he had self-packed his items. Graziano refused, however, because Domies had denied his request to itemize his property on the form. *Id.*, ¶ 299. Bogardus, Minich, and two additional officers then escorted Graziano to his hearing. Graziano asked these officers what the misconduct charge was for and was told that he would find out at the hearing. As he got dressed, Graziano overheard "Bogardus tell Unit Sgt. Kobchick, CO1 Domies and COT Ferrell, 'He [Plaintiff] is going to the hold [RHU] regardless. . .'" *Id.*, ¶ 303. At the hearing, presiding officer Fiscus informed Graziano "she had convicted him in absentia and sentenced him to 45 days of disciplinary custody (DC) for misconduct # D485643." *Id.*, ¶ 307.

As Graziano awaited RHU processing, he saw Fiscus and called her over. Graziano informed her that Dupont's dismissal of Misconducts D485643 and D485608 prohibited her from retrying him for Misconduct D485643. In response, Fiscus said: "You should have taken the Swift sanction CO1 Morgan initially offered you . . . I bet you're regretting that now aren't you?" *Id.*, ¶ 309. "In addition, Hex Fiscus, CO1 Minich and CO1 Witness of DC-141, Part 2D[RH17], signed a hearing waiver on January 8, 2021, falsely attesting that [Graziano] refused to attend the . . . misconduct hearing on January 8, 2021, and refused to sign said hearing waiver." *Id.*, ¶ 311. Following his placement in the RHU, Graziano appealed Fiscus' hearing determination, first to the PRC, and then to Oberlander after the PRC denied it. On February 3, 2021, Graziano received Oberlander's decision "dismiss[ing] misconduct # D485643 and permit[ing] recharge." *Id.*, ¶ 315.

On February 13, 2021, Morgan issued Graziano Misconduct No. D485627, re-charging him with loaning or borrowing property. He again appeared before Fiscus, who again found him guilty and sentenced him to forty-five days in the RHU, less the days he had already served since his initial RHU placement on January 8, 2021 (he had not yet been released). Again, Graziano appealed this charge and, again, "the PRC, namely Major M. Blicha, CCPM Gustafson, DSCS Adams and DSFM Mongelluzzo," denied his appeal, but Oberlander granted it. *Id.*, ¶ 323. While Oberlander exonerated Graziano of the charge, Graziano had already completed his forty-five day sanction.

Upon his March 22, 2021, release from the RHU, Graziano was assigned to Unit F/B, another SCF Unit. A few days later, Morgan approached Graziano and said, "[a]pparently your grievances and lawsuits against the Swift program are not working in your favor because here you are again . . . You know F/B unit is a Swift block like E/A unit and like in E/A, it applies to all the inmates on the unit, including you." *Id.*, ¶ 328.

20

**F.  Asserted Retaliation Based on Restriction of Visitor's Telephone & Visiting Privileges**

In March of 2021, DOC personnel removed Ms. DiNardi from Graziano's approved call and visitation list despite Graziano's having had frequent communication and visits with her without incident for more than twenty-five years . Ms. DiNardi's removal occurred a few months after she began communicating with DOC personnel about Graziano's MH treatment and disciplinary proceedings.  Ms. DiNardi first contacted Biel about Graziano's MH treatment on December 19, 2020.  After a series of emails, she warned Biel that "she would add A/O Biel to a list of 'defendants' she had on a current court issue if A/O Biel failed to act in accordance with the law regarding [Graziano's] MH needs."  *Id.*, ¶ 334.  On January 18, 2021, Ms. DiNardi sent the DOC Secretary an email "demanding [Graziano's] immediate release from the RHU and a thorough investigation into the matter and his ongoing differential and retaliatory treatment and hardship from staff at SCI-Forest."  *Id.*, ¶ 335.  Ms. DiNardi received a response from the Secretary's office explaining that her concerns would be forwarded to SCI-Forest's administration. On March 11, 2021, Ms. DiNardi presented the same complaint and demands to Biel via email, and Biel responded that Graziano can pursue his concerns through the administrative process.  *Id.*, ¶ 337.

When Graziano attempted to call Ms. Dinardi eight days later, "the DOC's phone automated system told him her telephone number was not on his approved phone list."  *Id.*, ¶ 338. Graziano then submitted an Inmate Request seeking an explanation and received a response confirming that Ms. DiNardi had been removed from his approved call list at the behest of UM Perrin.  Around this time, Ms. DiNardi received a letter from Oberlander declaring "that he had removed her from [Graziano's] approved visiting list and permanently suspended her visiting privileges at SCI Forest and all other SCI facilities supposedly because while [Graziano] was

housed at SCI Rockview he was found to be in possession of two cell phones that were in the name of Ms. DiNardi." *Id.*, ¶ 340.

Graziano grieved the phone call and visiting restriction on March 19 and March 22, 2021. On May 24, 2021, Oberlander reinstated DiNardi as an authorized phone and email communications contact for Graziano, and he allowed DiNardi to have virtual visits with Graziano but declined to reinstate "in-person and non-contact visits." *Id.*, ¶¶ 342, 343.

### G.  Asserted Retaliation By Way Of Grievance Restriction

Reeher placed Graziano on the maximum (90 days) grievance restriction on April 1, 2021. Graziano appealed this restriction.  Oberlander and final review affirmed the restriction.

### H.  Asserted Sexual Harassment/Denial of Medical Care/Violation of Medical Privacy and Confidentiality

While Graziano was in the RHU in June of 2021, he submitted four sick-call slips.  On June 22, 2021, Leslie came to Graziano's RHU cell in response to these sick-call slips.  Graziano asked Leslie if they could meet outside so Leslie could "physically examine him . . . and" so he could "disclose his medical issues in private from neighboring prisoners and non-medical staff." *Id.*, ¶ 352.  Leslie agreed.  He then "pretend[ed] to be going to have RHU officers escort [Graziano] out of the cell, but instead returned to medical[,] leaving [Graziano] waiting in vain." *Id.*, ¶ 353. Graziano grieved Leslie's behavior.   However, Reeher rejected this grievance because of Graziano's grievance restriction.

Leslie returned to Graziano's RHU cell three days later.  Again, Graziano requested they meet outside of his cell for the same reasons.  Leslie then said to him: "Show me your d*** tattoo and I'll have you pulled out." *Id.*, ¶ 356.  Graziano responded, "What the f*** did you just say/?!" *Id.*, ¶ 357.  Leslie replied, "You heard me." *Id.*, ¶ 358.  To which Graziano asked, "Are you

serious?" *Id.*, ¶ 359. Leslie then said, "Put in another sick-call slip when you're ready to show me." *Id.*, ¶ 360.

Graziano grieved this exchange on June 28, 2021. "Reeher rejected this grievance and sent a copy to the Security Office and the Prison Rape Elimination Act (PREA) Compliance Manager for initiation of an investigation." *Id.*, ¶ 361.

Graziano transferred to SCI-Camp Hill three days later, after which Gross interviewed him about the incident and then offered him counseling. Graziano accepted this invitation and participated in the counseling. On August 2, 2021, Security Lt. Mihal also interviewed him about the interaction with Leslie. Graziano never heard back about the grievance he filed at SCI-Forest despite his attempts to obtain answers from Reeher and Mihal.

### I. Asserted Conspiracy/Retaliatory Interference with Court Access by Confiscation and Destruction of Legal Property.

In preparation for his transfer to SCI-Camp Hill, Graziano filled three boxes with legal materials, including the complaint and related documents for the instant action. A couple of weeks after his July 1, 2021, transfer, Dickey told Graziano he needed to pick up his property, which consisted of only one of the three boxes of legal work Graziano had packed at SCI-Forest. Further, "at least a quarter of the legal paperwork [Graziano] packed/shipped in the original box was missing." *Id.*, ¶ 376.

Because the legal paperwork concerned three civil suits Graziano had initiated against SCI personnel, including Dickey, who had worked at SCI-Forest during Graziano's time there and was a named Defendant, Graziano concluded that his legal work had gone missing as retaliation. He therefore asked Dickey if his retaliatory treatment would continue at SCI-Camp Hill, to which Dicky said, "I mean . . if you keep filing paperwork, you know how that goes." *Id.*, ¶ 381.

Ms. DiNardi subsequently asked a SCI-Forest mailroom employee about the missing boxes. This employee informed her that the UPS tracking numbers showed that SCI-Camp Hill had received all three boxes on July 2, 2021, and provided Ms. DiNardi with the boxes' tracking numbers. Graziano received the missing two boxes on July 23, 2021; however, his civil rights complaint in this action along with other legal paperwork he had reported missing were not in either box. He grieved these missing papers on August 1, 2021; his grievance was rejected at each level of the grievance process.

After he redrafted the complaint, he gave it and related documents to Miller on September 8, 2021, to copy and return to him. By September 13, Graziano had yet to receive the copies from Miller, prompting Graziano to file a grievance. The next day, Miller informed Graziano that she had his copies and asked him to sign a grievance withdrawal form. Graziano inspected the copied documents and noticed that his complaint was missing. Consequently, he refused to sign her requested withdrawal form.

Graziano grieved the missing copy of his complaint shortly after. The Facility Manager rejected his grievance, explaining that the records showed that Miller had returned his requested photocopies and documents. The Final Appeal Decision upheld the Facility Manager's decision. On October 14, 2021, Graziano gave R. Miller sixteen legal documents to photocopy. He then asked for the return of these documents on the October 19, 20, and 21. R. Miller told him that he would ask CC Miller for these documents. On October 21, UM R. Miller told Graziano to ask the library for his copies. Graziano argued back, to which R. Miller "told him, 'Get the f*** away from me now!'" *Id.*, ¶ 401. Graziano then asked Security to preserve the video of this interaction. Security declined, explaining to Graziano that they do not provide such a service without a subpoena.

The library sent Graziano a communication on October 27, 2021, informing him that they complied with his copy request on October 15 and placed the copies in "I-Blk's mailbox" that day. *Id.*, ¶ 404. Graziano grieved these missing documents on November 3, 2021.

On December 14, 2021, Graziano was informed that "42 pages of legal documents belonging to him were confiscated and given to Lt. Dickey because the material was considered 'questionable litigation against Lt. Dickey and other correctional staff.'" *Id.*, ¶ 412. Graziano never recovered 42 pages of his original complaint or sixteen other legal documents.

### IV.    The Counts

Graziano asserts the following twenty claims:

- Count I: Eighth and Fourteenth Amendment claim for "deliberate indifference to deprivation of basic human needs" against UM Miller, DSCS Adams, DSFM Mongelluzzo, Supt. Oberlander, CHCS Smith, LPM Simons, Dr. Camacho, CRNP Byers, and CRNP Gressel, *see id.*, ¶¶ 419-23;

- Count II: First, Eighth, and Fourteenth Amendment claims, a civil rights conspiracy claim, and § 1985 conspiracy claim against CHCA Smith, DSCS Adams, DSFM Mongelluzzo, Supt. Oberlander, LPM Simons, Dr. Camacho, CRNP Gressel, and PSS Cowan, *see id.*, ¶¶ 424-29;

- Count III: First, Eighth, and Fourteenth Amendment claim for "deliberate indifference to serious medical needs" against CHCA Smith, DSCS Adams, DSFM Mongelluzzo, Supt. Oberlander, LPM Simons, Dr. Camacho, and CRNP Gressel, *see id.*, ¶¶ 430-33;

- Count IV: Eighth Amendment claim for "failure to intervene" against LPM Simons, Dr. Camacho, and CRNP Gressel, *see id.*, ¶¶ 434-37;

- Count V: Eighth and Fourteenth Amendment violations and an ADA violation for "denial of ADA assessment and accommodations" against CHCA Smith, DSCS Adams, and Supt. Oberlander, *see id.*, ¶¶ 438-41;

- Count VI: Eighth Amendment claim for "excessive force" against Lt. Haggerty, Lt. Deal, Lt. Dickey, six John Does ("CERT Officers #1-6"), and Supt. Oberlander, *see id.*, ¶¶ 442-46;

- Count VII: Eighth Amendment claim for "deliberate indifference" against Supt. Oberlander and Lt. Dickey, *see id.*, ¶¶ 447-50;

- Count VIII: assault and battery claim under Pennsylvania law against Lt. Haggerty, Lt. Deal, Lt. Dickey, CERT Officers # 1-6, and Supt. Oberlander, *see id.*, ¶¶ 451-53;

- Count IX: First, Eighth, and Fourteenth Amendment claim for "retaliation for exercising right of free speech and court access" against UM Miller, UM Crowther, CO1 Morgan, HEX Fiscus, Supt. Oberlander, DSCS Adams, and DSFM Mongelluzzo, *see id.*, ¶¶ 454-56;

- Count X: Eighth and Fourteenth Amendment claim for "due process" against UM Crowther, CO1 Morgan, HEX Fiscus, Supt. Oberlander, DSCS Adams, DSFM Mongelluzzo, CCPM Gustafson, CO1 Minich, and John Doe ("CO1 Witness of DC-141, Part 2D"), *see id.*, ¶¶ 457-60;

- Count XI: First, Eighth, and Fourteenth Amendment claim, a civil rights conspiracy claim, and a § 1985 conspiracy claim against HEX Fiscus, Lt. Bogardus, CO1 Minich, and CO1 Witness of DC-141, Part 2D, *see id.*, ¶¶ 461-64;

- Count XII: false imprisonment claim against UM Crowther, CO1 Morgan, HEX Fiscus, Supt. Oberlander, DSCS Adams, DSFM Mongelluzzo, CCPM Gustafson, Lt. Bogardus, and CO1 Minich, *see id.*, ¶¶ 465-67;

- Counts XIII and XIV: First Amendment claim for "retaliation for exercising right to free speech" against UM Perrin, Supt. Oberlander, DSCS Adams, DSFM Mongelluzzo, CCPM Gustafson, and A/O Biel,[7] *see id.*, ¶¶ 468-70;

- Count XV: First and Fourteenth Amendment claim for "retaliation for exercising right to free speech and court access" against CSA Reeher and Supt. Oberlander, *see id.*, ¶¶ 475-78;

- Count XVI: Eighth and Fourteenth Amendment claim for "denial of medical care and deliberate indifference to serious medical needs" against NP Leslie, *see id.*, ¶¶ 479-81;

- Count XVII: First, Fourth, and Fourteenth Amendment claim under § 1983 and § 1985 "civil conspiracy to retaliate for exercising right to free speech and court access" claims against Lt. Dickey, *see id.*, ¶¶ 482-85;

- Count XVIII: First, Fourth, and Fourteenth Amendment violations, and § 1983 and § 1985 "civil conspiracy to retaliate for exercising right to free speech and court access" claims against Lt. Dickey, Librarian Criley, U.M. R. Miller, and CC Miller, *see id.*, ¶¶ 486-90;

- Count XIX: intentional infliction of emotional distress ("IIED") claim under Pennsylvania tort law against all Defendants, *see id.*, ¶¶ 491-93; and

- Count XX: negligent infliction of emotional distress ("NIED") claim under Pennsylvania tort law against all Defendants, *see id.*, ¶¶ 494-96.

---

[7] Count XIV adds detail to the allegations asserted in XVIII; in all other respects, the counts are the same.

## V.      Discussion

The Centurion Defendants argue that (1) the statute of limitations bars certain claims against them, (2) Graziano did not exhaust his administrative remedies with respect to his claims against Centurion, and (3) the counts asserted against them (Counts I, II, III, IV, XIX, and XX) fail to state a claim for relief.[8]  DOC Defendants contend that (1) Counts I-V, IX-XII, XIV, XV, XVII, and XVIII fail to state a claim for relief, (2) Count V fails to demonstrate the DOC Defendants personal involvement, and (3) Counts VIII, XII, XIX, and XX are barred by the doctrine of sovereign immunity.[9]  The Court will address these arguments in turn.

### A. Whether Graziano's claims are time-barred cannot be determined on the face of the Complaint.

Pennsylvania's two-year statute of limitations for personal injury actions applies to Graziano's constitutional and state law claims. *See Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); *Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 457 n.9 (3d Cir. 1996) (citing 42 Pa. C.S. § 5524).  Federal law determines the date of accrual of a claim and, thus, when the statute of limitations period begins to run.  *See Montanez v. Sec'y Pennsylvania Dep't of Corr.*, 773 F.3d 472, 480 (3d Cir. 2014).  A § 1983 claim accrues "when the plaintiff has 'a complete and present cause of action,'" or in other words, "when the wrongful act or omission results in damages." *Dique v. New Jersey State Police*, 603 F.3d 181, 185–86 (3d Cir. 2010) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).  "The determination of the time at which a claim accrues is an objective

---

[8] The Centurion Defendants also argue that the Complaint does not comply with the pleading standards set forth in Fed. R. Civ. P. 8(a)(2) because "[t]he claims span several years and are completely unrelated to one another"; and "the pleading is confusing and difficult, if not impossible, to understand."  ECF No. 71.  The Court agrees that the Complaint presents a prolix screed of largely unrelated grievances against numerous prison officials and staff at multiple institutions over an extended period.  Nevertheless, given Graziano's *pro se* status and his allegations acknowledging mental illness, the Court has read his pleading with a degree of tolerance that it would not have accorded to a pleading drafted by counsel.

[9] DOC Defendants submit that "Graziano at least pleads a colorable claim" at this stage in the litigation in Counts VI, VII, XIII, and XVI, though XVI is not asserted against DOC Defendants.  ECF No. 61, p. 12.

inquiry" concerned with "what a reasonable person should have known." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Pennsylvania's discovery rule will toll the statute of limitation on a § 1983 claim until "the plaintiff knows, or reasonably should know, (1) that [the plaintiff] has been injured, and (2) that [his or her] injury has been caused by another party's conduct." *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991) (quoting *Cathcart v. Keene Indus. Insulation*, 324 Pa. Super. Ct. 123, 471 A.2d 493 (Pa. Super. Ct. 1984)). But "[a] plaintiff's ignorance regarding the full extent of his injury is irrelevant to the discovery rule's application, so long as the plaintiff discovers or should have discovered that he was injured." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015).

Under the prison mailbox rule, the Court treats the filing of Graziano's Complaint as April 12, 2022, the day he signed his pleading.[10] ECF No. 14, p. 11. Absent tolling, the statute of limitations thus bars Graziano's claims that accrued earlier than April 12, 2020, two years before he signed the Complaint. The Centurion Defendants argue this bar extends to every claim asserted against them because the claims are "based on conditions of [Graziano's] confinement known to him on January 24, 2019," the day he transferred to SCI-Forest. ECF No. 71. Graziano responds that the limitations period for his claims were tolled while he exhausted the administrative grievance process, and his "ineffective course of [mental health] treatment was an ongoing course of conduct." ECF No. 99, p. 57. The Court agrees for purposes of the motion to dismiss.

---

[10] Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]." *Galtoghab v. Doe*, 2016 WL 757739, at *3 (W.D. Pa. 2016) (quoting *Commonwealth v. Little*, 716 A.2d 1287 (Pa. Super. Ct. 1998)).

1.   **Graziano's claims accrued at different times for purposes of the statute of limitations.**

Federal law determines the date of accrual of a claim and, thus, when the statute of limitations period begins to run. *See Montanez v. Sec'y Pennsylvania Dep't of Corr.*, 773 F.3d 472, 480 (3d Cir. 2014). A federal claim accrues "when the plaintiff has 'a complete and present cause of action,'" or in other words, "when the wrongful act or omission results in damages." *Dique v. New Jersey State Police*, 603 F.3d 181, 185–86 (3d Cir. 2010) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Likewise, a claim under Pennsylvania law accrues at "the occurrence of the final significant event necessary to make the claim suable." *Mack Trucks, Inc. v. Bendix– Westinghouse Automotive Air Brake Co.,* 372 F.2d 18, 20 (3d Cir.1966). Pennsylvania's discovery rule also applies to Callahan's § 1983 claim and tolls the statute of limitations until "the plaintiff knows, or reasonably should know, (1) that [the plaintiff] has been injured, and (2) that [his or her] injury has been caused by another party's conduct." *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991) (quoting *Cathcart v. Keene Indus. Insulation*, 324 Pa. Super. Ct. 123, 471 A.2d 493 (Pa. Super. Ct. 1984)). *See also Montanez*, 773 F.3d at 480 (quoting *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009)) ("Under federal law, a cause of action accrues 'when the plaintiff knew or should have known of the injury upon which the action is based.'") (further internal citation omitted). But "[a] plaintiff's ignorance regarding the full extent of his injury is irrelevant to the discovery rule's application, so long as the plaintiff discovers or should have discovered that he was injured." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015).

"A claim alleging deliberate indifference to serious medical needs accrues when the plaintiff knows or has reason to know that deliberate indifference is displayed." *Matos-Ramirez v. Northampton Cnty. Jail Med. Expert*, 2021 WL 3722262, at *4 (E.D. Pa. Aug. 23, 2021) (citing *Smith v. Municipality of Lycoming Cty.*, 335 Fed. Appx. 147, 149 (3d Cir. 2009) (per curiam)

(prisoner alleging deliberate indifference to medical needs "knew, or had reason to know, of his alleged mistreatment when it occurred"). *See Green v. Philadelphia Cty. Prisons*, 2006 WL 2869527, at *6 (E.D. Pa. Oct. 4, 2006) (plaintiff's injuries and his § 1983 Eighth Amendment cause of action accrued when the defendants "displayed deliberate indifference to his medical needs" because "on those days [plaintiff] should have known he was injured under the Eighth Amendment"). Stated differently, "[a] deliberate indifference claim will … accrue, and the statute of limitations for that claim will begin to run, when Plaintiff became aware of the fact that he wasn't receiving appropriate treatment." *Campbell v. Doe*, 2017 WL 349289, at *3 (D.N.J. Jan. 24, 2017) (citing *Hughes v. Kniebhlher*, 341 Fed. Appx. 749, 751-52 (3d Cir. 2009); *Baker v. Barnes*, 2012 WL 95363, at *4 (D.N.J. Jan. 12, 2012)). However, "the exact timing of any delay in providing medical treatment may not present a bright line of demarcation" for purposes of the statute of limitations. *Houser v. Folino*, 2014 WL 3696130, at *24 (W.D. Pa. July 23, 2014) (adopting Report and Recommendation). Ultimately, "the determination of the time at which a claim accrues is an objective inquiry" concerned with "what a reasonable person should have known." *Kach*, 589 F.3d at 634.

### 2.   Only Graziano's conditions of confinement claims accrued prior to April 12, 2020.

Graziano's allegation that Byers and Camacho violated his constitutional and state law rights by failing to address "the worsening psychological and physiological conditions [Graziano] was experiencing due to his early medication intake and torturous living conditions (cell intercom announcements/protractive cell lighting)" while at SCI-Forest accrued before April 12, 2020. ECF No. 11, ¶ 68. Graziano avers that his medication stopped working two weeks after his transfer to SCI-Forest, and he began complaining to Byers, Camacho, and others

about this "as early as February, 2019." *Id.*, ¶ 62.  He also told them that the "early medication

intake and torturous living conditions . . . were upsetting his preexisting [mental health]

conditions," and repeated these concerns to Camacho "during their tele-med appointments," the

last of which occurred on September 15, 2020. *Id.*, ¶ 62, 65.  But Camacho and Byers repeatedly

responded that they had no control over the inmate count, announcements, and medication time

procedures.  ECF No. 11, ¶ 62.  Graziano also alleges that Byers and Camacho's failure to

"ensure [Graziano] received his psychiatric medication at bedtime . . . or mitigate his torturous

living conditions . . . effectively defeated" the MH treatment plan his PRT introduced him to in

July 2018. *Id.*, ¶ 75.  Graziano also alleges that Byers and Camacho's failure to "ensure

[Graziano] received his psychiatric medication at bedtime . . . or mitigate his torturous living

conditions . . . effectively defeated" the MH treatment plan his PRT introduced him to in July

2019. *Id.*, ¶ 75.  Graziano further stipulates that Byers and Camacho violated his rights when he

learned on January 15, 2020, that his PRT had denied his request to move to the SNU, even

though the SNU had a later medication line time and "MH related programs and groups." *Id.*, ¶

76.  Graziano knew of the injuries caused by SCI-Forest's inmate count, announcements, and

medication line procedures, and Byers and Camacho's failure to remedy these harms, long

before April 12, 2020.  Thus, these claims are time-barred absent equitable tolling.  Less clear is

whether Graziano's claim that Camacho and Gressel "deprived [him] of adequate [mental health]

care" falls within the two-year limitations period. *Id.*, ¶ 432.

Graziano argues that his claims of "ineffective course of [mental health] treatment was an

ongoing course of conduct that cannot be reduced to a single date because it did not have a

degree of permanence." ECF No. 99, p.57.  The Court agrees.

"The continuing violation doctrine, where applicable, provides an 'exception to the normal knew-or-should-have-known accrual date.'" *Powell v. Wetzel*, 2016 WL 8731445, at *9 (M.D. Pa. Sept. 13, 2016), *report and recommendation adopted*, 2016 WL 8710470 (M.D. Pa. Sept. 30, 2016) (quoting *Gonzales v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999))). A "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir. 1982) (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981), *abrogated on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)). "This doctrine operates as a type of tolling and is often applied to address injuries that are the 'collective result of many non-actionable' slights." *Patterson v. Strippoli*, 639 Fed. Appx. 137, 141 (3d Cir. 2016) (quoting *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 387 n.3 (D.N.J. 2011)). *See O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (noting that the doctrine applies to hostile-environment claims, which are "designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant"). "Discrete acts that are individually actionable, however, constitute separate unlawful practices and cannot be aggregated into a hostile-environment claim." *Powell*, 2016 WL 8731445, at *9 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-114 (2002)). And "the continuing violation doctrine does not apply when the plaintiff 'is aware of the injury at the time it occurred.'" *Montanez*, 773 F.3d at 481 (3d Cir. 2014) (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003)).

Reading the Complaint liberally, it alleges facts that plausibly support Gressel and Camacho's alleged ongoing deliberate indifference to Graziano's mental health needs. The

Complaint alleges that Camacho's relevant conduct began in February 2019, when Graziano first complained of his living conditions to his PRT, and ended sometime after his September 15, 2020, tele-med appointment with Dr. Camacho. The Complaint alleges that Gressel's relevant conduct began after Graziano in June 2020, and ended upon his transfer to SCI-Camp Hill. The factual averments against these Defendants cover several plausibly related instances of mental health care and treatment, including their virtual appointments, and responses to his suicidal ideations, mental health diagnoses, and treatment decisions. Based on Graziano's allegations, it cannot be said as a matter of law that, aside from Camacho's discrete alleged failure to change Graziano's living conditions, any of the conduct upon which he bases his claims against Gressel and Camacho constitute discrete acts rather than a continuing pattern of conduct. As such, any further analysis of the statute of limitations will need to await a more developed record. *See McPhee v. DePuy Orthopedics, Inc.*, 989 F. Supp. 2d 451, 465 (W.D. Pa. 2012) (whether the statute of limitations barred certain claims was "not apparent from the face of the Complaint" because the court could not "determine[e] the date on which the cause of action accrued," and so could not "calculate the expiration of the … statute of limitations period.").

### 3.    Whether any of Graziano's claims are saved by equitable tolling cannot be determined based on the face of the Complaint.

Graziano submits that the time he spent grieving his mental health care claims sufficiently tolls the statute of limitations for these claims. Under the federal Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, a prisoner is required to exhaust available prison administrative remedies before commencing a lawsuit asserting claims based on his or her conditions of confinement. While the prisoner exhausts such administrative remedies, the statute of limitations is tolled. *Wisniewski v. Fischer*, 857 F.3d 152, 158 (3d Cir. 2017). *See also Carter v. Pennsylvania*

*Dept. of Corrections*, 2008 WL 5250433, at *11 (E.D. Pa. Dec. 17, 2008) ("[T]he statute of limitations begins to run only when [a] plaintiff has exhausted his administrative remedies under the PLRA."). A plaintiff is not deemed to have exhausted his administrative remedies until a final appeal decision on his grievance. *See Fennell v. Cambria Cty. Prison*, 607 Fed. Appx. 145, 149 (3d Cir. 2015) ("proper exhaustion" means a prisoner's completion of the administrative review process).

In his Complaint, Graziano avers that "[d]uring his incarceration at SCI Forest, [he] filed over one hundred (100) inmate grievances relating to issues which adversely affected his MH and defeated his MH treatment plan." ECF No. 11, ¶ 61. *See id.*, n.4. He further maintains that he "exhausted his administrative remedies with respect to all claims and defendants." *Id.*, ¶ 418. Centurion Defendants retort that he "never exhausted administrative remedies as to Defendant Centurion" and the sole grievance Graziano filed pertaining to Byers, Camacho, and Gressel's conduct does not extend the accrual date enough to save the claims. ECF No. 100, p. 2. Whether exhaustion of his administrative remedies sufficiently tolls his time-barred claims cannot be known from the record properly before the Court at this time.

Centurion Defendants maintain that Graziano's grievance record belies his contention that exhaustion saves his claims. They append to their motion allegedly "full and complete copies of any and all grievances" Graziano fully exhausted, as well as "a spreadsheet outlining [Graziano's] extensive grievance history." ECF No. 71, p. 9. Notably absent from this record, however, is a sworn declaration certifying that the documents constitute a complete and accurate record of Graziano's grievance proceedings. *See Sims v. Wexford Health Sources*, 2015 WL 4041771, at *5 (W.D. Pa. July 1, 2015), *aff'd*, 635 Fed. Appx. 16 (3d Cir. 2015). "Absent such authentication, this Court cannot rely on such documents to definitively conclude that [Graziano]

has failed to exhaust his administrative remedies as to the claims raised against" Centurion; or

that only one of the over one-hundred grievances Graziano allegedly filed could toll his claims

against Byers, Camacho, and Gressel. *Id.* Thus, the Court cannot say as a matter of law that the

time-barred claims against Centurion, Byers, Camacho, and Gressel are not saved by equitable

tolling at this juncture. As such, the face of the Complaint does not permit dismissal of any of

Graziano's claims against Centurion Defendants based on the statute of limitations. This

holding, however, does not preclude Defendants from raising their statute of limitations

affirmative defense at a later stage of this case based on a more complete record.

> **B.    Whether Graziano exhausted his claims against Centurion cannot be determined based on the record presently before the Court.**

Centurion Defendants next submit that the claims against Centurion must be dismissed

because Graziano did not exhaust his administrative remedies. "The Prison Litigation Reform

Act of 1995 (PLRA) requires a prisoner to exhaust any available administrative remedies before

challenging prison conditions in federal court." *Woodford v. Ngo*, 548 U.S. 81, 81 (2006).

"Exhaustion is considered separately for each claim brought by an inmate, and if a complaint

includes both exhausted and unexhausted claims, courts will dismiss the latter but not the

former." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (citing *Jones v. Bock*, 549 U.S.

199, 219-20 (2007)). The failure of an inmate to exhaust available administrative remedies is an

affirmative defense that the defendant must plead and prove. *See Jones*, 549 U.S. at 216. And

"[i]n appropriate cases, failure to exhaust may be raised as the basis for a motion to dismiss."

*Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (citing *Ray v. Kertes*, 285 F.3d 287, 295 n.8

(3rd Cir. 2002).

The Supreme Court has held that the PLRA requires "proper exhaustion," meaning

"complet[ing] the administrative review process in accordance with the applicable procedural

rules," *Woodford*, 548 U.S. at 88, which are supplied by the individual prisons, *Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). To determine whether exhaustion was proper, the court "evaluat[es] compliance with the prison's specific grievance procedures," which in Pennsylvania's state prison system are set out in DOC Policy DC-ADM 804, "and analyz[es] whether the procedures were 'available' to the inmate." *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010)) (citing *Small v. Camden County*, 728 F.3d 265, 269, 271 (3d Cir. 2013); 42 U.S.C. § 1997e(a)). The purpose of this stringent application of the exhaustion requirement is to alert the prison officials to a problem and allow the officials to remedy the problem before it is litigated in court; it is "not to provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d. Cir. 2007) (quoting *Jones*, 549 U.S. at 219 (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004))).

Proper exhaustion also applies to the substance of the grievance. Section 11(d) of DC-ADM 804 mandates that the inmate "shall identify individuals directly involved in the events." *Green v. Maxa*, 2020 WL 1249205, at \*5 (W.D. Pa. Mar. 16, 2020). *See also* Jackson *v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir. 2020). Because the identification requirement is mandatory, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005) (failure to identify defendants in grievances "means that [plaintiff] failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA").

Centurion Defendants argue that Graziano did not exhaust his remedies for the claims alleged against Centurion because he did not name Centurion in any of his grievances. This may be true; however, Defendants' failure to authenticate the grievance record prohibits the Court from relying on these documents to confirm their position. Accordingly, the Court cannot hold as a matter of law that Graziano failed to exhaust his administrative remedies with respect to his claims against Centurion.[11]

### C. Eighth Amendment Claims

The Complaint appears to allege Eighth Amendment conditions of confinement and deliberate indifference claims against DOC and Centurion Defendants. DOC Defendants argue that the Complaint fails to state a conditions of confinement claim based on the living conditions at SCI-Forest, SCF units, and the RHU. DOC Defendants also submit that the Complaint fails to assert an Eighth Amendment deliberate indifference to serious medical needs claim based on his mental health treatment and Oberlander, Smith, and Adams alleged failure to provide Graziano with accommodations for the living conditions. Centurion Defendants likewise assert that the Complaint fails to show how their treatment of Graziano's serious mental health needs manifested deliberate indifference. The Court agrees.

### 1. The Complaint fails to state an Eighth Amendment conditions of confinement claim against any DOC or Centurion Defendant.

The Eighth Amendment's prohibition of cruel and unusual punishment imposes constitutional limitations on a prisoner's conditions of confinement. *See Rhondes v. Chapman,*

---

[11] The Court notes that though Graziano names Centurion as a Defendant, the factual allegations do not mention Centurion and the only counts that appear to be brought against Centurion are Counts XIX and XX, which are brought against all Defendants. And as discussed below, these claims are dismissed on the merits. Additionally, to the extent Graziano intends to assert any of the constitutional claims against Centurion, Centurion Defendants correctly argue that Graziano does not plead that Centurion had "an official corporation policy or custom result[ing] in" an "alleged constitutional deprivation." ECF No. 71, p. 16 (citing *Natale v. Camden County Corr. Facility*, 318 F.3d 575 (3d Cir. 2003); *Monell v. Dep't of Soc. Servs. Of city of New York*, 436 U.S. 658 (1978).

452 U.S. 337 (1981); *Graham v. Connor*, 490 U.S. 386 (1989); *Wilson V. Seiter*, 501 U.S. 294 (1991).  "[A] prison official violates the Eighth Amendment only when two requirements are met." *Giblom v. Gillipsie*, 435 Fed. Appx. 165, 168 (3d Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  First, the plaintiff must allege a deprivation that is "objectively, sufficiently serious." *Beers-Capitol*, 256 F.3d at 125 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (quotation marks and citations omitted).  The objective component is narrowly defined: only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  A prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  These needs include "food, clothing, shelter, sanitation, medical care and personal safety." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir.1997).  "[A] totality of the circumstances test must be applied to determine whether the conditions of confinement constitute cruel and unusual punishment." *Tillery v. Owens*, 907 F.2d 418, 427 (3d Cir. 1990).

Second, the plaintiff must show that the prison official "subjectively acted with a sufficiently culpable state of mind, i.e., deliberate indifference." *Tillman v. Lebanon County Correctional Facility*, 221 F.3d 410, 418 (3d Cir. 2000).  "This subjective component is also narrowly construed." *Henry v. Overmyer*, 2013 WL 3177746, at *2 (W.D. Pa. June 24, 2013).  A prison official's conduct violates the Eighth Amendment "only if he knows that the inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* (quoting *Farmer*, 511 U.S. at 847) (alterations in original).

Graziano alleges that SCI-Forest's "protractive cell lighting, successive cell intercom announcements and facility dispensary schedules which prevented [him] from receiving his psychiatric medications at their prescribed time" amounts to unconstitutional living conditions. ECF No. 11, ¶ 420. The Complaint avers that the "bright cell count lights," "line movements and unit announcements" "deprived [him] of peace, equanimity and sleep." ECF No. 11, ¶¶ 53, 52, 54. Additionally, Graziano's "early medication intake . . . disrupted his equilibrium and aggravated his preexisting anxiety and depressive disorders." *Id.*, ¶ 50. These conditions allegedly caused Graziano's "decompensation and sleep deprivation," which led to his "psychological and physiological deterioration." *Id.*, ¶¶ 58, 59, 54. Graziano further avers that his inability to obtain ADA accommodations for the inmate count, announcement, and medication line procedures violated the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.*, 439.

Graziano fails to allege an "extreme deprivation of life's basic necessities" as contemplated by the Eighth Amendment. Though plausibly annoying, the three brief periods of night time light fall far short of the "bright, constant illumination" the Third Circuit has found violative of the Eighth Amendment. *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d Cir. 2019) (quoting *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996)) (24 hours a day of "bright, constant illumination causing 'grave sleeping problems and other mental and psychological problems' can establish an Eighth Amendment deprivation"). *See Molina v. Harry*, 2019 WL 3958422, at *3 (M.D. Pa. Aug. 22, 2019) (Plaintiff's assertion of "large bright lights directly in front of his bed ... [that] shone into his cell (24) hours per day" stated an Eighth Amendment deprivation, especially when "mutually enforced" by Plaintiff's noise complaints) (citations omitted).[12] The allegations also do not demonstrate that the announcements

---

[12] Nevertheless, "[c]ontinuous lighting has been held to be permissible and reasonable in the face of legitimate penological justifications, like the need for security and the need to monitor prisoners." *Huertas v. Sec'y Pennsylvania*

constituted noise "so excessive and pervasive that it posed a serious risk of injury to" him.

*Whitney v. Wetzel*, 649 Fed. Appx. 123, 127 (3d Cir. 2016). *See id.* (Plaintiff's allegation that he

"was forced to live with mentally ill inmates" who "created intolerable noise" by "banging on

toilets and sinks" did not meet the objective component of an Eighth Amendment claim).

Moreover, because the announcements ceased by 9 PM, the noise did not "mutually enforce[e]"

the effects of the lights. *Wilson,* 501 U.S. at 304 ("Some conditions of confinement may

establish an Eighth Amendment violation 'in combination' when each would not do so alone, but

only when they have a mutually enforcing effect that produces the deprivation of a single,

identifiable human need."). And the early medication line time does not equate to a deprivation

of medical care. Accordingly, the Complaint fails to establish that his conditions of confinement

while in general population, and his inability to receive accommodations for these conditions,

amount to a violation of the Eighth Amendment.[13]

Graziano further avers that his placement in the SCF unit violated his Eighth amendment

rights because he did not consent to the program and "SCF lacked MH provisions to protect [his]

MH status." ECF No. 11, ¶ 455. Additionally, he maintains that his placement in the RHU

constituted cruel and unusual punishment "[Mental Health] status placed him at heightened risk of

harm when held in solitary confinement." *Id.*, ¶ 458. *See id.*, ¶ 462.

---

*Dep't of Corr.*, 533 Fed. Appx. 64, 68 (3d Cir. 2013) (citing *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir.1987) and *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

[13] DOC Defendants additionally contend that Count V fails to allege the personal involvement of Adams, Oberlander, and Smith, which is a requirement of a § 1983 claim. *Gould v. Wetzel*, 2013 WL 5697866, at *2 (3d Cir. Oct. 21, 2013) (It is axiomatic that liability under § 1983 requires a defendant's "personal involvement" in the deprivation of a constitutional right.). The Complaint appears to premise Oberlander and Adams' personal involvement solely on their supervisory roles, and thus fails to demonstrate their personal involvement. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) (Like that of any defendant, a supervisor's liability must be based on "personal involvement in the alleged wrongs."). However, Graziano's assertion that Smith did not assess his ADA accommodation request prior to submitting it to the appropriate DOC office, as was required by her position as the CHCA, suffices to demonstrate her personal involvement at this early stage in the proceedings.

These allegations do not plead an objectively serious deprivation. Graziano's conclusory assertion that the SCF unit lacks mental health care does not constitute a deprivation of medical care, and there is no other indication that the SCF program deprived him of "the minimal civilized measure of life's necessities." *Wilson*, 501 U.S. at 304. His conclusory allegation of the RHU's unconstitutional conditions similarly fails to demonstrate that his forty-five days in disciplinary custody "violate[d] civilized standards of humanity and decency." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997) (citing *Young v. Quinlan*, 960 F.2d 351, 359 (3d Cir.1992)). *Cf. Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017). As such, the Court dismisses the Eighth Amendment conditions of confinement claims asserted in Counts I, III, IX, X, XI pursuant to Rule 12(b)(6) and in Count V pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

### 2. The Complaint fails to allege an Eighth Amendment deliberate indifference to serious medical needs claim against any DOC or Centurion Defendant.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *See Estelle v. Gamble*, 429 U.S. 97 (1976)) (internal quotation omitted). To establish a violation of his constitutional right to adequate medical care, a plaintiff must allege facts that demonstrate: (1) he had a serious medical need, and (2) acts or omissions by prison officials that reflect deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists when a "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of

injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

The Complaint's allegations concerning the nature and severity of Graziano's mental health satisfy the "serious medical need" element of his Eighth Amendment claim. Accordingly, only the second prong of the deliberate indifference test is at issue here–whether the treatment of Graziano's mental health manifested a deliberate indifference to his serious medical need.

It is well-settled that "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." *Tillery v. Noel*, 2018 WL 3521212, at \*5 (M.D. Pa. June 28, 2018) (collecting cases). Such complaints fail as constitutional claims because "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")). "Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983." *Tillery*, 2018 WL 3521212, at \*5 (citing *Gause v. Diguglielmo*, 339 Fed. Appx. 132 (3d Cir. 2009) (characterizing a dispute over pain medication as the type of "disagreement over the exact contours of [plaintiff's] medical treatment" that does not violate the constitution)).

Similarly, "the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation." *Id.* (quoting *Estelle*, 429 U.S. at 106). "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of

prisoners." *Durmer*, 991 F.2d at 67 (citations omitted).  And the Third Circuit has made clear that "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Wisniewski v. Frommer*, 751 Fed. Appx. 192, 195-96 (3d Cir. Oct. 3, 2018) (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017)).  Thus, "courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care." *Hensley v. Collins*, 2018 WL 4233021, at *3 (W.D. Pa. Aug. 15, 2018) (quoting *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000)).

Here, Graziano submits that Defendants Simons, Camacho, Gressel, Smith, Adams, Mongelluzzo, and Oberlander "deprive[d] [him] of adequate MH Care,"  ECF No. 11, ¶ 431, and Simons, Camacho, and Gressel "faile[d] to intervene to stop [his] psychological decompensation upon learning from" Graziano that his living conditions "were preventing him from taking his psychiatric medication at the prescribed time and exacerbating his preexisting MH conditions," ECF No. 11, ¶ 435.  He further asserts that these "[D]efendants were empowered to provide input, recommendations and referrals concerning [his] mental health needs," but "refused [his] request" to delay his medication line time and transfer him into the SNU, in violation of his Eighth Amendment rights.  *Id.*, ¶ 436.

The Complaint is replete with evidence of Graziano's continuous and robust mental health care and treatment.  Graziano states that his mental health care resumed upon his transfer to SCI-Forest, and his anti-depressants continued to be prescribed.  He asserts that while at SCI-Forest, he "met with psychology staff virtually every 30 days, and psychiatric staff virtually every 90 days in accordance with DOC Policy," *id.*, ¶ 72, and "during Jan. and July 2019," met with the PRT approximately ten times, *id.*, ¶ 73.  After making numerous complaints to his

medical team, Graziano's PRT designed a new Individual Recovery Plan aimed at treating his depressive disorder, anxiety disorder, and trauma, as well as managing his sleep and medication. Defendants communicated Graziano's suicidal ideations to one and other and scheduled numerous follow-up appointments with Graziano, though he refused to attend some of them. *See e.g.*, ECF No. 11, ¶ 93, 107, 156. Graziano additionally received near continuous prescriptions for Remeron, Cymbalta, Voltaren, and Vistaril. In fact, Defendants stopped a medication only when responding to Graziano's complaints of a medication's side effects or ineffectiveness and started him on a different medication shortly after he had weaned off the other one.

The Complaint's detailed documentation of Graziano's mental health care and treatment throughout his incarceration at SCI-Forest belies his deliberate indifference claims. Graziano makes clear that he took issue with the mental health treatment he received. But his "disagreement with prison personnel over the exercise of medical judgment does not state a claim for relief." *Young v. Quinlan*, 960 F.2d 351, 358 n.18 (3d Cir. 1992). *See Payo*, 2022 WL 912588, at *8 ("Without more, however, his disagreement does not support an Eighth Amendment claim or demonstrate deliberate indifference to his serious medical needs.). Indeed, Courts have routinely found that regular assessment, treatment, and care like that provided in this case do not support a finding of deliberate indifference under the Eighth Amendment. *See, e.g.*, *Payo v. Stechschulte*, 2022 WL 912588, at *7 (W.D. Pa. Mar. 29, 2022) (No deliberate indifference found where it was undisputed that "Plaintiff was seen, evaluated and treated on a regular basis and was prescribed medication as medically needed."); *Gause*, 339 Fed. Appx. at 135 (Deliberate indifference standard unmet where "[Plaintiff's] medical records show that he was seen many times by the prison medical staff and received medicine, physical therapy, and even treatment outside of the prison," thus establishing that "[Plaintiff] received medical care.").

The consistent medical treatment provided to Graziano also hinders the success of the deliberate indifference claims asserted against non-medical prison officials.  "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).   And where, like here, "a prisoner is under the care of medical experts," "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  *Id.*  Accordingly, Counts III and IV fail to state a claim of deliberate indifference to Graziano's serious medical needs, and the Court dismisses these claims with prejudice pursuant to Rule 12(b)(6).

### D.  First Amendment Claims

The Complaint appears to assert First Amendment retaliation, free speech, and access to court claims against DOC and Centurion Defendants.  DOC Defendants insist that the access to court claims fail because Graziano has not alleged an injury and that he has no constitutional right to visitation privileges and short-term grievance restrictions.  The Court addresses these arguments and screens the remaining First Amendment claims in accordance with 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

### 1.    Retaliation Claims

To state a retaliation claim, Graziano must plausibly plead that (1) he engaged in protected activity; (2) officials took an adverse action against the plaintiff; and (3) "a causal link" exists "between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (alteration in original)); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir.

2003).  *See also Golden v. Perrin*, 2022 WL 2791186, at *4–5 (W.D. Pa. July 15, 2022).  "[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." *Anderson v. Davilla*, 125 F.3d 148, 161 (3d Cir. 1997).

When analyzing whether an inmate engaged in constitutionally protected activity, courts should be mindful that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Jones v. North Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  Still, "prison inmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system." *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990) (citing *Turner v. Safley*, 482 U.S. 78 (1987)); *Pell v. Procunier*, 477 U.S. 817, 822 (1974).

An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights.  *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).  This is an objective inquiry. *See Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012).  "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Id.* at 224 (internal quotation marks and citation omitted).  The retaliatory conduct "need not be great in order to be actionable" but must be "more than *de minimus*." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotations omitted).

Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of

antagonism coupled with timing that suggests a causal link.  *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).  "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).  With these principles in mind, the Court will examine each of Graziano's retaliation claims.

> **a.  The retaliation claim asserted in Count IX against UM Miller, UM Crowther, CO1 Morgan, HEX Fiscus, Supt. Oberlander, DSCS Adams, and DSFM Mongelluzzo must be dismissed.**

Count IX avers that Miller, Crowther, Morgan, Fiscus, Oberlander, Adams, and Mongelluzzo "subject[ed] [Graziano] to SCF . . . to punish [him] for trying to undermine the legitimacy and application of SCF and to deter his efforts" because they knew he did not want to participate in the program and that it lacked mental health provisions.  ECF No. 11, ¶ 455.  The allegations suffice to show a constitutionally protected activity but fail to allege the second and third elements of a retaliation claim.

According to the Complaint, Graziano challenged the legality of the SCF program and his involuntary placement in the program in grievances and a lawsuit.  The filing of a lawsuit and grievances represents protected activity within the scope of the first element of a retaliation claim.  *See e.g.*, *Watson v. Rozum*, 834 F.3d 417, 422–23 (3d Cir. 2016) (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).  But placing Graziano in an SCF unit does not represent an adverse consequence.  Per the allegations, SCF units are merely general population housing units that adhere to an alternative discipline scheme.  Moreover, "SCF applied to all the residential inmates on [Graziano's] unit without exceptions."  As such, his required participation in SCF did not subject him to "a disadvantageous change in housing assignment, placement in

restricted housing or restrictive confinement . . . or a detrimental change in program level."
*Watson*, 834 F.3d 417, 423 (Plaintiff suffered an adverse consequence when Defendant charged him with a Class I misconduct because "Class I misconducts subject inmates to a range of sanctions, including a disadvantageous change in housing assignment, placement in restricted housing or restrictive confinement for up to 90 days, or a detrimental change in program level.").

Even if he had alleged an adverse act, no plausible basis exists for inferring any Defendant's retaliatory motive.  The complaint does not specify whether any of these Defendants are named in the grievances challenging the SCF, and the lawsuit is initiated against the DOC. Further, the Complaint makes clear that Defendants' implementation of the SCF program was at the behest of the DOC.  Accordingly, the Court perceives no basis upon which to infer a causal connection, and thus, to permit this claim for retaliation to proceed.

The pleading also does not state a retaliation claim based on his placement in the RHU. Graziano appears to aver that Morgan issued him a false misconduct for his legal objections to the SCF program and refusal to accept the Swift.  Under a liberal reading of the Complaint, Graziano again meets the first element of a retaliation claim.  At this stage in the proceedings, Morgan's issuance of misconduct D485627 constitutes an adverse action because Graziano spent 45 days in the RHU before Oberlander dismissed the misconduct.  *See Watson*, 834 F.3d 417, 423; *Smith v. Mensinger*, 293 F.3d 641, 653-654 (3d Cir. 2002) (fabricated misconduct charge against inmate sufficiently deterring); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (several months in disciplinary confinement would deter a reasonably firm prisoner from exercising First Amendment rights).

However, it is mere speculation on Graziano's part that Morgan and Fiscus' conduct was in retaliation for his legal filings.  Morgan issued Graziano the Swift four months after he told

Morgan about his lawsuit.  This time-lapse, without more, does not suggest that Morgan had a

retaliatory motive.  *See Williams v. Nyberg*, 2023 WL 4628378, at *6 (W.D. Pa. May 10, 2023),

*report and recommendation adopted*, 2023 WL 4628402 (W.D. Pa. July 19, 2023) (citing

*Escanio v. United Parcel Serv.*, 538 Fed. Appx 195, 200 (3d Cir. 2013) (Court of Appeals for the

Third Circuit has concluded that a period of roughly three weeks between the protected activity

and the adverse action, without more, was not unduly suggestive of retaliatory motive).  *See also*

*Williams v. Pennsylvania Dep't of Corr.*, 2020 WL 5237606, at *9 (W.D. Pa. Aug. 14, 2020),

*report and recommendation adopted*, 2020 WL 5231417 (W.D. Pa. Sept. 2, 2020), 2020 WL

583983 (noting that periods of seventeen days, three weeks, seven weeks, and between one and

three months had each been deemed insufficient to establish causation) (citing *Burt v. Lane*, 2017

WL 4681807, at *9-10 (M.D. Pa. Apr. 4, 2017)).  Fiscus' comment likewise suggests only that

sanctions for a Swift are less severe than sanctions for a misconduct, and no other circumstantial

evidence supports such a motive for her allegedly improper hearing and unsupported guilty

finding and consequential sanction. [14]

### b.  Count XIV states a First Amendment retaliation claim against Oberlander, but fails against Perrin, Adams, Mongelluzzo, Gustafson, and Biel.

Next, Graziano maintains that Perrin, Oberlander, Adams, Mongelluzzo, Gustafson, and

Biel removed Ms. DiNardi from his approved phone call and visiting lists in retaliation for the

complaints against them that he relayed through DiNardi.  In Count XIII, Graziano insists that

Defendants caused DiNardi to be removed from his phone list because of "his grievances against

the defendants through [Ms. DiNardi], who at the time acted as [his] power of attorney and

advocate."  ECF No. 11, ¶ 469.  Count XIV similarly declares that Defendants "voted to

---

[14] The allegations also fail to demonstrate Oberlander, Adams, and Mongelluzzo's personal involvement in his placement in the SCF and RHU.

terminat[e] [Graziano's] visiting privileges with [Ms. DiNardi]" because he had her "report his unlawful RHU confinement by Hex Fiscus and his grievances about" his "inadequate MH care … to Secretary Wetzel, Supt. Oberlander and local elected government officials, and" because she "threatened A/O Biel with court action if [Biel] failed to properly address [his] issues." ECF No. 11, ¶ 472. Graziano's allegation that through Ms. DiNardi he informed these Defendants of the substance of his grievances and intention to take legal action satisfies the first element of the retaliation claim. *Cf. Hill v. Barnacle, 509 F. Supp. 3d 380 (W.D. Pa. 2020)* (wife of inmate had constitutionally protected interest in "the November 5, 2011 letter in which [she] expressed concerns to a number of people about the treatment her husband was receiving"). And termination of his communication privileges with DiNardi for roughly two and a half months and permanently in-person visiting privileges may constitute an adverse act. *See id.* (inmate's wife suffered an adverse act when her visiting privileges were suspended); *cf. Cordero v. Warren*, 612 Fed. Appx. 650, 653 (3d Cir. 2015) ("A fact finder could similarly conclude that a person of ordinary firmness would be deterred by the prospect of losing visitation with a *close family member* for *six months* or more.") (emphasis added). *But see Bullock v. Buck*, 2014 WL 4925275, at *6 (W.D. Pa. Sept. 30, 2014) ("sixty days without the ability to make phone calls or buy things from the commissary" was not an adverse action). But Graziano has not alleged facts sufficient to support the personal involvement of Adams, Mongelluzzo, Gustafson, or Biel in the adverse act. A defendant in a § 1983 action "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)). It is the plaintiff's burden to "show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his

rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. Sept. 14, 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)). Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient. *See Van Tassel v. Piccione*, 608 Fed. Appx. 66, 69-70 (3d Cir. 2015). Graziano avers that UM Perrin caused DiNardi to be removed from his approved contacts list, and the Complaint infers that Oberlander caused DiNardi to be removed from his visitor list. No other Defendant's personal involvement in these acts can be inferred from the allegations.

However, the claim against Perrin nevertheless fails because the allegations do not support a causal connection between Graziano's protected conduct and Perrin's alleged adverse act. Graziano avers that DiNardi's removal from his call sheet occurred because "[he] was relaying his grievances against the defendants through [DiNardi,]." *Id.*, 469. But the allegations do not specify when Perrin learned of Graziano's grievances and lawsuit. The Complaint states only that DiNardi exchanged emails with Biel, and "emailed John Wetzel and other correctional staff at SCI Forest" about Graziano's allegedly unlawful treatment. These general assertions do not raise a plausible inference that Perrin knew of these communications, the timing of any such knowledge, or what grievances allegedly motivated Perrin's alleged adverse conduct. Count XIII thus fails to allege a viable cause of action for retaliation against Perrin, Adams, Mongelluzzo, Gustafson, or Biel. Accordingly, the Court will dismiss this claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

The allegations of Count XIII, however, are minimally adequate to support a retaliation claim against Oberlander. Graziano avers that Oberlander informed Ms. DiNardi "that he had removed her from [Graziano's] approved visiting list and permanently suspended her visiting privileges" and that, in contrast to his allegations against the other Defendants, Graziano avers

that DiNardi communicated his grievances and legal filings to Oberlander. *Id.*, ¶ 340. [15] And

because Oberlander appears to have revoked DiNardi's visiting privileges shortly thereafter, a

causal connection between the constitutionally protected conduct and Oberlander's adverse

action can be inferred. Thus, the retaliation claim asserted in Count XIV may proceed against

Oberlander.[16]

### c. Count XV fails to state a retaliation claim against CSA Reeher and Supt. Oberlander based on Graziano's exercise of his First and Fourteenth Amendment rights.

Lastly, Graziano alleges that Reeher and Oberlander placed him on the maximum

grievance restriction (90 days) "without justification" in retaliation for exercising his right to free

speech and court access. According to the Complaint, Reeher placed him on this restriction in

accordance with DOC policy because his grievances were found to be frivolous. Graziano

disputed Reeher's characterization of his grievance and appealed Reeher's restriction.

Oberlander denied his appeal. Graziano alleges that "Reeher placed [him] on grievance

restriction to silence him in retaliation for his filing of grievances threatening to bring civil action

against SCI Forest staff." *Id.*, ¶ 348.

Graziano's grievance filings and threats of litigation are protected conduct. However,

Oberlander's denial of Graziano's grievance restriction appeal does not constitute an adverse act.

*See Owens v. Coleman*, 629 Fed. Appx. 163, 167 (3d Cir. 2015) (holding that the "denial of

grievances is not an 'adverse action' for retaliation purposes"). This claim against Oberlander

will therefore be dismissed. In contrast, Reeher's placement of Graziano "on the maximum

---

[15] In the Complaint, Graziano adds that Oberlander explained to DiNardi that the reason for her removal was that Graziano had been found with two of her cell phones when he was incarcerated at SCI-Rockview twenty years earlier. The Court takes no position on the validity of this claim at this time.

[16] Graziano's conclusory allegations of retaliation in Counts II and XVII additionally fail to state a claim for relief and these claims are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

grievance restriction" allegedly "because he filed grievances, not because the grievances he filed were frivolous," can constitute an adverse act. *Glenn v. DelBalso*, 599 Fed. Appx. 457, 458 (3d Cir. 2015) (citing *United States v. Miller*, 197 F.3d 644, 648 (3d Cir.1999) (citation omitted). Nevertheless, the retaliation claim against Reeher fails because the allegations do not support a causal connection between the threat to sue and the grievance restriction. *See id.* at 458-59. Courts have repeatedly declined to find a causal connection "when the alleged perpetrator of the retaliatory activity was not the subject of the constitutionally protected activity." *Robinson v. Delbalso*, 2023 WL 2760425, at *11 (M.D. Pa. Mar. 31, 2023) (citing *Calloway v. Bauman*, 2022 WL 4357468, at *9 (M.D. Pa. Sep. 20, 2022)) (parentheticals omitted); *Victor v. Lawler*, 2010 WL 5014555, at *5 (M.D. Pa. Dec. 3, 2010), *aff'd*, 565 Fed. Appx. 126 (3d Cir. 2014); *Evans v. Rozum*, 2009 WL 5064490, at *22 (W.D. Pa. Dec. 17, 2009) ("There is no apparent reason why [the moving defendants] would want to retaliate against Plaintiff for filing a lawsuit against others."); *Royster v. Beard*, 308 Fed. Appx. 576, 579 (3d Cir. 2009) (affirming summary judgment in favor of defendant on plaintiff's claim that he was retaliated against by a defendant who was not the target of his protected activity). Graziano's attempt to show a causal connection by stating that the grievances communicated his intentions to sue "SCI-Forest staff" is too general to support a plausible inference that Reeher acted with a retaliatory motive. *See Minor v. Overmyer*, 2022 WL 1126228, at *9 (W.D. Pa. Feb. 14, 2022), *report and recommendation adopted*, 2022 WL 969754 (W.D. Pa. Mar. 31, 2022), *aff'd*, 2022 WL 2826437 (3d Cir. July 20, 2022) (quoting *Miskovitch v. Hostoffer*, 721 F. Supp. 2d 389, 396 (W.D. Pa. 2010)) ("To support this last element, 'a plaintiff must come forward with more than 'general attacks' upon the defendant's motivations'"). Accordingly, the retaliation claim against Reeher will also be dismissed.

## 2.  Graziano's allegations fail to state an access to courts claim.

Graziano appears to assert a First and Fourteenth Amendment access to Courts claim based on Defendants' alleged retaliatory conduct. *See* Counts IX, XIII, XIV, and XV. Additionally, Count XVII alleges that Dickey violated his First, Fourth, and Fourteenth Amendment rights by contributing to the disappearance of Graziano's initial complaint. ECF No. 11, ¶ 484. And in Count XVIII, Graziano avers that Dickey, Criley, UMR. Miller, and CC Miller "improperly confiscate[ed] [Graziano's] 42 pages of legal documents . . . two call sheets . . . and other evidentiary documents," which resulted in Graziano's delayed filing of the Complaint. *Id.*, ¶ 489.

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). "Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit." *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). "[T]he underlying cause of action, ... is an element that must be described in the complaint." *Christopher*, 536 U.S. at 415.

Graziano is actively pursuing the above-captioned action. Accordingly, Defendants' alleged conduct has not prevented him from initiating this lawsuit or otherwise caused him to lose a nonfrivolous claim. Graziano has therefore failed to allege an injury to support an access-to-courts claim. Accordingly, the Court dismisses with prejudice the access to court claims asserted in Counts IX, XIII, XIV, and XV under its screening obligation and in Counts XVII and XVIII pursuant to Rule 12(b)(6).

### 3. The Complaint fails to state a First Amendment Freedom of Speech Claim.

Graziano asserts the Defendants' conduct related to the SCF program, the misconduct hearing, his RHU placement, the termination of his communication and visiting privileges with Ms. DiNardi, his grievance restriction, and his missing documents constitute violations of his free speech rights under the First Amendment. *See* Counts XIII, XIV, XV, XVII, XVIII.

While inmates retain "the protections afformed by the First Amendment," *see O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), but they "retain[ ] [only] those First Amendment rights that are not inconsistent with [their] status as [ ] prisoner[s] or with the legitimate penological objectives of the corrective system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "An inmate's First Amendment right to free speech, therefore, may be curtailed if the inmate's speech poses 'the likelihood of disruption to prison order or stability, or otherwise interferes with the legitimate penological objectives of the prison environment.'" *Jones v. N.C. Dep't of Corr.*, 433 U.S. 119, 132 (1977); *see also Turner v. Safley*, 482 U.S. 78, 87 (1987) (noting that prison regulations can restrict free speech if such restrictions are "reasonably related to legitimate penological interests"). "Thus, an inmate's First Amendment rights do not include the right to debate staff orders prior to obeying them, disregard prison rules, or engage in activities that may incite a disturbance." *Isaac v. Marsh*, 2020 WL 6504637, at *4 (M.D. Pa. Nov. 5, 2020) (quoting *Parran v. Wetzel*, 2016 WL 1162328, at *6 (M.D. Pa. Mar. 23, 2016)). Types of speech that are also unprotected "include, but are not limited to, fighting words, threats, obscenity, and speech that 'imminently incites illegal activity.'" *Id.* (quoting *Parran*, 2016 WL 1162328, at *6). The Complaint's conclusory allegations do not support a finding that any Defendant infringed upon any protected speech of Graziano. Indeed, he does not specify what speech Defendants sought to prohibit, what conduct

constituted such prohibition, or when this conduct occurred.  Thus, the free speech claims based on protected speech are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

### E.  Fourteenth Amendment Claims

The DOC Defendants next assert that Count V fails to state a Fourteenth Amendment equal protection claim, Count XIV fails to state a due process claim, and the more specific provision rule bars Count V's substantive due process claim and all other alleged Fourteenth Amendment violations "that are covered by more specific constitutional provisions."  ECF No. 61, p. 7. Centurion Defendants likewise argue that Graziano's Fourteenth Amendment claims in Counts I-III are duplicative of his Eighth Amendment claims and add that the Complaint fails to state a viable due process violation.  The Court agrees and further finds that the Complaint fails to state a viable Fourteenth Amendment procedural due process claim.

### 1.  The more specific provision rule bars the Fourteenth Amendment conditions of confinement, deliberate indifference, court access, and retaliation claims.

"Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994).  *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)) ("if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").  In accordance with this "more specific provision" rule, an inmate's "claim concern[ing] his conditions of confinement and an alleged failure by the Defendants to ensure his safety ... fit squarely within the Eighth

Amendment's prohibition on cruel and unusual punishment." *Scott v. Clark*, 2020 WL 4905624, at *7 (W.D. Pa. July 28, 2020), *report and recommendation adopted*, 2020 WL 4904212 (W.D. Pa. Aug. 20, 2020) (*quoting Beenick v. LeFebvre*, 684 Fed. Appx. 200, 205 (3d Cir. Apr. 11, 2017) (citation omitted)).  Likewise, a court evaluates an inmate's "Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment" because the Supreme Court held in *Estelle* that the Eighth Amendment proscribes deliberate indifference to prisoners' serious medical needs." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing 429 U.S. at 103–04).  And Graziano's retaliation and access to courts claims are properly analyzed under the rubric of the First Amendment, as discussed *supra*. *See DeFranco v. Miller*, 2021 WL 6498250, at *6 (W.D. Pa. Oct. 4, 2021), *report and recommendation adopted*, 2021 WL 6037580 (W.D. Pa. Dec. 21, 2021) (dismissing Fourteenth Amendment retaliation claim under the more specific provision rule); *Miller v. Hartwell*, 2022 WL 768295, at *3 (W.D. Pa. Mar. 14, 2022) (dismissing Fourteenth Amendment due process claim as redundant of First Amendment access to courts claim) (citations omitted).  Accordingly, the Court dismisses *with prejudice* the Fourteenth Amendment conditions of confinement claims asserted in Counts I, III, V, and XI, deliberate indifference to serious medical needs claims asserted in Counts III and XVI, [17] retaliation claims asserted in Counts IX, XIII, XIV, XV, XVII, and XVIII, and access to courts claims asserted in Counts IX, XV, XVII, and XVIII.

---

[17] The Court dismisses the Fourteenth Amendment claim asserted in Count XVI pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A.

## 2. The Complaint fails to state a procedural due process claim.

The Complaint also fails to state a procedural due process claim against certain DOC Defendants based on the disposition of misconducts D041270, D041275, and D485643, his consequential placement in the RHU, or his subsequential move to an SCF unit.[18] "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000)). Graziano's procedural due process claims fail because his 45-day confinement in the RHU was too short to implicate a liberty interest, and the facts alleged in the Complaint do not support an inference that his placement in the SCF unit "amount[ed] to an 'atypical and significant hardship' when compared to the ordinary incidents of prison life." *Nifas v. Beard*, 374 Fed. Appx. 241, 244 (3d Cir. 2010) ("confinement in AC for 178 days and a 90-day placement on the RRL does not amount to an 'atypical and significant hardship' when compared to the ordinary incidents of prison life"). *See also Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir.2002) (seven months in disciplinary confinement did not implicate a liberty interest); *Torres v. Fauver*, 292 F.3d 141, 151–52 (3d Cir. 2002) (disciplinary detention for fifteen days and administrative segregation for 120 days did not implicate a protected liberty interest);; *Sanchez v. Walton*, 2019 WL 249537, at *2-3 (E.D. Pa. Jan. 16, 2019) ("ninety (90) day confinement in segregation is insufficient to establish that [inmate] was deprived of a liberty interest"). The absence of allegations to trigger due process protections requires the dismissal of all procedural due process claims asserted in Counts IX, X, XI under the court's screening authority.[19]

### 3.    The Complaint fails to state a claim under the Fourteenth Amendment's equal protection clause.

The Complaint contends that Defendants denied Graziano's "right to equal protection of the law under the . . . Fourteenth Amendment." ECF No. 11., ¶¶ 420, 426, 458,462, 476, 480, 483, 487 (Counts I, IX, X, XI, XV, XVI, XVII, and XVIII).  To establish a violation of the Equal Protection Clause, a plaintiff must ordinarily allege "that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional discrimination based on his membership in a protected class." *Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016) (citing *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015)). The Complaint is devoid of factual allegations to support that Graziano was treated differently than any other similarly situated person or persons.  As such, the equal protection claims must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

### F.  Fourth Amendment Claims

Graziano has also failed to state a plausible claim under the Fourth Amendment.  In Counts XVII and XVIII, Graziano avers that Defendants violated his Fourth Amendment right not to be subjected to unreasonable searches and seizures by causing or contributing to the alleged disappearance of his legal papers.  But Graziano has no legitimate expectation of privacy in the documents he claims were lost. *Hudson v. Palmer*, 468 U.S. 517, 530 (1984); *see Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) ("The defendants correctly assert that prisoners do not

---

[18] Defendants are Crowther, Morgan, Fiscus, Oberlander, Adams, Mongelluzzo, Gustafson, and CO1 Witness of DC-141, Part 2D.

[19] The Complaint does not support a procedural due process claim for the alleged confiscation of Graziano's documents in Counts XVII and XVIII because Graziano has the right to file a grievance or a conversion and replevin action in state court to seek "a meaningful post-deprivation remedy." *DeFranco*, 2021 WL 6498250, at *6 (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available.")).

have a Fourth Amendment right to privacy in their cells."). *See also Ivy v. Wetzal*, 2021 WL

4479721, at *12 (W.D. Pa. Sept. 30, 2021) ("Ivy had no reasonable expectation of privacy in the

papers discussed in his Complaint."); *Com. v. Moore*, 928 A.2d 1092, 1099 (Pa. Super. Ct.

2007) (no reasonable expectation of privacy in incoming and outgoing prisoner mail under

Fourth Amendment).   Accordingly, the Fourth Amendment claims asserted in Counts XVII and

XVIII are dismissed with prejudice pursuant to § 1915(e)(2)(B) and § 1915A(b).

### G. Civil Rights Conspiracy and 1985(3) Conspiracy Claims

The Centurion Defendants argue that Count II of the Complaint fails to state a civil rights

conspiracy claim.  The Court agrees.  The Court further finds that the Complaint fails to state a

civil rights conspiracy claim and a Section 1985 conspiracy claim against any Defendant and

dismisses these claims pursuant to § 1915(e)(2)(B) and § 1915A(b).

### 1.    Counts II, XI, XVII, and XVIII fail to state a civil rights conspiracy claim.

To state a civil rights conspiracy claim, the plaintiff must allege: "1) the specific conduct

that violated the plaintiff's rights, 2) the time and the place of the conduct, and 3) the identity of

the officials responsible for the conduct." *Sanchez v. Coleman*, 2014 WL 7392400, at *9 (W.D.

Pa. Dec. 11, 2014) (citing *Oatess v. Sobolevitch*, 914 F.2d 428, 431 n.8 (3d Cir.1990)).  Critical

to this claim is the complaint's "factual allegations of combination, agreement, or understanding

among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry

out the alleged chain of events." *Id.* (quoting *Spencer v. Steinman*, 968 F.Supp. 1011, 1020

(E.D. Pa.1997)). *See also Loftus v. Southeastern Pa. Transp. Auth.*, 843 F.Supp. 981, 987 (E.D.

Pa.1994) ("[w]hile the pleading standard under [Fed. R. Civ. Proc .] Rule 8 is a liberal one, mere

incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the

Rule's requirements").  Bare allegations that "[d]efendants engaged in a concerted action of a

kind not likely to occur in the absence of agreement" are insufficient.  *Id.*  It is likewise

"insufficient to allege that 'the end result of the parties' independent conduct caused plaintiff

harm or even that alleged perpetrators of the harm acted in conscious parallelism."  *Parness v.*

*Christie*, 2015 WL 4997430, at *11 (D.N.J. Aug. 19, 2015) (quoting *Desposito v. New Jersey*,

2015 WL 2131073, at *14 (D.N.J. May 5, 2015)).  "Additionally, as Section 1983 does not

create a cause of action for conspiracy in and of itself, a plaintiff must also allege some

underlying deprivation of a constitutional right."  *Id.* (quoting *Holt Cargo Systems, Inc. v.*

*Delaware River Port Auth.*, 20 F.Supp.2d 803, 843 (E.D. Pa. 1998)).

      Graziano asserts four conspiracy claims.  Count II states that Smith, Adams, Mongeluzzo,

Oberlander, Simons, Camacho, Gressel, and Cowan "conspired, planned, agreed and intended to

harass, intimidate and cause psychological and physiological injury to [Graziano]" by

"undermin[ing] [his] MH related claims," "depriv[ing] him of the MH provisions his MH status

entitled him to," and "punish[ing] him through the infliction of cruel and unusual punishment."

*Id.*, ¶¶ 425, 428.  Count XI asserts that Fiscus, Bogardus, Minich, and CO1 Witness of DC-141,

Part 2D conspired to place him in the RHU for the misconduct that they knew had already been

dismissed.  Count XVII avers that "Dickey's threats of 'continued' retaliatory treatment if

[Graziano] persisted in filing paperwork implicated Lt. Dickey as a conspirator in an active

concerted effort to chill [Graziano's] exercise of his first [sic] and fourteenth [sic] amendment

rights."  *Id.*, ¶ 484.  And Count XVIII asserts a conspiracy claim against Dickey, Criley, UM R.

Miller, and CC Miller for "improperly confiscating [Graziano's] 42 pages of legal documents."

*Id.*, ¶ 487.

      Even under the most charitable reading, the Complaint fails to state a civil rights

conspiracy claim against any Defendant.  "[T]he allegations of conspiracy must be grounded

firmly in facts; they cannot be conclusory nor can they hinge on bare suspicions and foundationless speculation." *Reed v. Harpster*, 506 Fed. Appx. 109, 111 (3d Cir. 2012) (citing *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir.1991) (affirming dismissal of conspiracy claims based upon mere suspicion and speculation)). Graziano's conclusory allegations fall far short of supporting a plausible inference of an agreement or concerted effort among any combination of Defendants to harm him. Graziano's foundationless conspiracy claims must be dismissed.

### 2. Counts II, XI, XVII, and XVIII fail to state a Section 1985 conspiracy claim.

Graziano asserts a § 1985(2) conspiracy claim in Counts II and XI and an unspecified § 1985 conspiracy claim in Counts XVII and XVIII. Section 1985(1) prohibits a "conspiracy to prevent any person from accepting or holding office, trust, or place of confidence under the United States," and § 1985(2) prohibits a conspiracy to "deter . . . any party or witness in any court of the United States." Thus, § 1985(3) is Graziano's only potential avenue for relief.

To state a claim under § 1985(3), a plaintiff must allege facts to support "(1) a conspiracy; (2) for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Slater v. Susquehanna Cnty.*, 465 Fed. Appx. 132, 136 (3d Cir. 2012) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983)). Graziano's failure to allege a conspiracy dooms his § 1985(3) conspiracy claims. Further, nothing in the Complaint supports an inference "that the conspiracy was motivated by racial, gender, or other class-based discriminatory animus." *Id.* (citing *Farber*

*v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006)).  As such, the § 1985 conspiracy claims

must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).

### H.  The Complaint fails to state an ADA claim against Smith, Adams, and Oberlander in their individual capacities, but its allegations are minimally sufficient to state an ADA claim against the DOC.

Count V of the Complaint includes an "ADA accommodations" claim for monetary and

injunctive relief against Smith, Oberlander, and Adams in their individual and official capacities.

The Court construes this claim as asserted under Title II of the ADA.[20]  Section 12132 of Title II

provides, "[n]o qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  State

prisons are deemed "public entities" under Title II.  *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206,

210, (1998)).  And "the phrase 'service, program, or activity' under Title II ... is 'extremely

broad in scope and includes anything a public entity does,'" *Furgess v. Pa. Dept. of Corr.*, 933

F.3d 285, 289 (3d Cir. 2019).  As such, "a prison's refusal to accommodate inmates' disabilities

in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs

constitutes a denial of the benefits of a prison's services, programs, or activities under Title II"

of the ADA.  *Brown v. Monsalud*, 2021 WL 4502238, at \*3 (M.D. Pa. Sept. 30, 2021) (quoting

*Furgess*, 933 F.3d at 290 (internal quotation and citation omitted)).

Although the Court of Appeal for the Third Circuit has not addressed the issue

precedentially, most courts have held that Title II does not authorize suits against government

---

[20] Title I prohibits discrimination in employment, 42 U.S.C.A. § 12112(a), and the DOC does not fall within Title III's definition of "public accommodation," 42 U.S.C.A. § 12181(7).  *See Snider v. Pennsylvania DOC*, 505 F. Supp. 3d 360, 398 (M.D. Pa. 2020); *id.*, 398 n.156 (listing cases).  Thus, only Title II applies to this action.

officers in their individual capacities.  *See e.g., Kokinda v. Pennsylvania Dep't of Corr.*, 779 Fed.

Appx. 938, 942 (3d Cir. 2019) (concluding that plaintiff's "claims for individual damages

liability under Title II of the ADA fail for the simple reason that there is no such liability")

(citations omitted); *Holden v. Wetzel*, 2021 WL 1090638, at *3 (W.D. Pa. Mar. 22, 2021); *Miller

v. Little*, 2023 WL 3674336, at *8 (E.D. Pa. May 25, 2023) (quoting *Williams v. Hayman*, 657 F.

Supp. 2d 488, 502 (D.N.J. 2008)).  Accordingly, Graziano's individual capacity ADA claims

against Smith, Adams, and Oberlander must be dismissed with prejudice.

Here, however, Graziano also asserts his ADA claim against the individual DOC

Defendants in their official capacities.  "[S]tate officers can be sued for damages in their official

capacities for purposes of the ADA … unless barred by the Eleventh Amendment." *Durham v.

Kelley*, 2023 WL 6108591, at *2 (3d Cir. Sept. 19, 2023).   Such a claim is, in effect, a claim

against the governmental entity that the officials represent. *Id.*; *see also Monell v. Dep't of Soc.

Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978) ("official-capacity suits generally

represent only another way of pleading an action against an entity of which an officer is an

agent…").  Thus, courts have held that, "[g]enerally, the proper defendant for a Title II ADA

claim is the public entity or an individual who controls or directs the functioning of the public

entity…." *Miller*, 2023 WL 3674336, at *8.  At the same time, courts have expressed the view

that the preferred defendant is the public entity.  *See id.* (holding that "[b]ecause ADA claims

asserted against individual prison officials named in their official capacities are really claims

against the DOC, all ADA claims asserted against the individually-named DOC Defendants

[should be dismissed] as duplicative of the claim against the DOC") (citing *Emerson v. Thiel

College*, 296 F.3d 184, 189 (3d Cir. 2002)); *Robinson v. Pennsylvania Dep't of Corr.*, 2022 WL

970760, at *4 (E.D. Pa. Mar. 31, 2022) (dismissing official capacity ADA claims against

individual defendants as "duplicative" to claims against the DOC); *Dews v. Link*, 2021 WL 2223795, at *3 (E.D. Pa. June 2, 2021) ("[W]here the plaintiff simultaneously sues the state entity that employs the individual defendants, the claims against the individuals may be dismissed as duplicative of the claims against the state."). Thus, the Court construes the Complaint as asserting a Title II violation against the DOC.

The DOC Defendants argue that the Eleventh Amendment immunizes them from Graziano's ADA claim. The sovereign immunity afforded by the Eleventh Amendment provides states and state agencies – including the DOC and its officials – with immunity from suit in federal court unless, *inter alia*, this immunity has been abrogated by Congress or waived by the state. *See Durham*, 2023 WL 6108592, at *5 ("Whether New Jersey's sovereign immunity bars money damages under the ADA is a more complicated question that involves determining whether Title II of the ADA validly abrogated the State's sovereign immunity with respect to the claims at issue."); *MCI Telecomm Corp. v. Bell-Atlantic-Pennsylvania*, 271 F.3d 491, 503 (3d Cir. 2001). The United States Supreme Court has held that Title II of the ADA abrogates sovereign immunity only to the extent that state conduct violates the Constitution. *United States v. Georgia*, 546 U.S. 151, 159 (2006). This determination requires the court to: "(1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such conduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 553 (3d Cir. 2003).

### 1.    The Complaint states a Title II violation.

Applying these principles here, the Court must first consider whether Graziano has

alleged facts to support a claim for relief under Title II of the ADA–in other words, that he is a

qualified individual with a disability who was denied participation in a service by reason of his

disability. *Bowers*, 475 F.3d at 553.  "Thus, to state a claim under Title II of the ADA, plaintiffs

must demonstrate that: (1) they are qualified individuals; (2) with a disability; and (3) they were

excluded from participation in or denied the benefits of the services, programs, or activities of a

public entity, or were subjected to discrimination by any such entity; (4) by reason of their

disability." *Durham*, 2023 WL 6108591, at *3 (citation omitted).  Where, like here, the Plaintiff

seeks compensatory damages, he "must also show intentional discrimination under a deliberate

indifference standard." *Durham*, 2023 WL 6108591, at *4.  To do so, "[a] claimant must allege

'(1) knowledge that a federally protected right is substantially likely to be violated ... and (2)

failure to act despite that knowledge.'" *Id.*

Graziano alleges that the DOC violated Title II by "refusing to make reasonable

accommodations which would have enabled [him] to sleep, stay alert, concentrate, effectively

communicate and socially interact with others and participate in services, programs and activities

available to prisoners in general population."  ECF No. 11, ¶ 440.  In support of this claim, he

avers that the "early administration of his psychiatric meds . . . prolonged cell lighting and

constant intercom announcements" deprived him of sleep, which exacerbated his "anxiety and

depressive disorders" and "substantially limited him from major life activities."  ECF No. 11, ¶

225.  In his June 2019 Inmate Disability Accommodation Request Form, he specified that his

"sleep deprivation" disability prevented him from "sleep"; "affect[ed] [his] ability to read, learn,

think," "concentrate," "properly communicat[e] with [his] peers and staff," and "remain

medication complian[t]"; and "caus[ed] [him] to miss certain standing counts" and "meal-lines." ECF No. 15, p. 18. He additionally alleged that his "disabilities prevented him from participating in recreational activities" and "achieving any of the treatment goals set forth in his MH treatment plan" and caused him to drop out of a self-help group and computer class. ECF No. 11, ¶¶ 238, 243. To accommodate his disability, he asked the prison to: (1) turn off the cell count lights immediately after completing the count, (2) restrict "cell intercoms to medical emergencies and individualize[d] notifications," and (3) either move evening medication distribution to 5:30 PM or "transfer [him] to a suitable SCI where these institutional practices are uncustomary." *Id.* Graziano submitted this request form to Smith, who allegedly forwarded the request to the appropriate DOC office without first conducting her own assessment, in contravention of DC-ADM 006. In October 2019, the DOC office declined Graziano's accommodations request because of "safety, security and operational concerns of the institution." ECF No. 11, ¶ 232 (quoting ECF No. 15, p. 20). Oberlander informed Graziano of this determination a month later.

Accepting Graziano's factual allegations as true, and drawing all inferences in his favor, the Court finds that Graziano has sufficiently alleged a Title II violation and intentional discrimination. The exhibits to the Complaint demonstrate Graziano's various mental health needs and adequately support his status as a qualified individual with a disability. *See e.g.*, *Snider v. Pennsylvania DOC*, 505 F. Supp. 3d 360, 408 (M.D. Pa. 2020) (quoting 29 C.F.R. § 1630.2(j)(3)(iii)) (Plaintiff's mental health illnesses "'substantially limit brain function' for purpose of the definition of disability under the Disabilities Act."). Graziano's allegations are also adequate to support that the DOC's failure to grant his accommodation requests denied him the benefit of a prison service, program, or activity. Certain of Graziano's allegations

concerning this third element of his ADA claim are conclusory and therefore entitled to no

consideration of the validity of his claim.  *See* ECF No. 11, ¶ 440 (by "refusing to make

reasonable accommodations which would have enabled [him] … participate in services,

programs and activities available to prisoners in general population.").   But other allegations

state facts minimally sufficient to support a finding of the denial of such benefits.  *See* ECF No.

15 (Appendix to Complaint), p. 18 (refusal of Graziano's accommodation requests prevented

him from "properly communicat[ing] with [his] peers and staff" and "remaining medication

complian[t]," and "caus[ed] [him] to miss certain standing counts" and "meal-lines."); *see*

*Wareham v. Penn. Dept. of Corrections*, 2014 WL 3529996, at *11-12 (W.D. Pa. July 15, 2014)

(inmate's allegation that he missed "some meals and some yard-outs that he would have went to"

had he been offered reasonable accommodations for his mobility impairments was sufficient to

state an ADA violation); *Durham*, 2023 WL 6108591, at *3.[21]   Graziano's allegations are also

minimally sufficient to support the intentional discrimination/causation element of his ADA

claim.  *See Durham*, 2023 WL 6108591, at *4 ("Refusing to make reasonable accommodations

is tantamount to denying access, and the complaint pleads that Durham's requests for a cane and

shower chair were repeatedly refused."); *Dinkins v. Correctional Medical Services*, 743 F.3d

633, 634-35 (8th Cir. 2014) (alleged "denials of meals and adequate housing by reason of [a]

---

[21] These facts distinguish this case from those which have rejected ADA claims based simply upon allegations that prison officials neglected the disabled prisoner's medical needs.  *See Mattis v. Dep't of Corr.*, 2017 WL 6406884, at *16 (W.D. Pa. Dec. 15, 2017) (denial of necessary medical care "does not implicate a service, program, or activity contemplated by the ADA.") (listing cases); *Isley v. Beard*, 200 Fed. Appx. 137, 142 (3d Cir. 2006) ("finding that plaintiff had not claimed that he was excluded from any program on the basis of his disability but rather alleged "that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions"); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (a prison's failure to attend to the medical needs of its disabled prisoners or grant a requested special accommodation, absent factual allegations of discrimination, does not violate the ADA).  However, to the extent Graziano contends that the failure to accommodate him by modifying policies and transferring him prevented him from participating in or benefiting from sleep, "[s]leeping in one's cell is not a 'program' or 'activity.'"  *Mattis*, 2017 WL 6406884 (quoting *Bryant*, 84 F.3d at 249).

disability" can form the basis for a viable ADA claim). Finally, as previously noted, because Graziano seeks compensatory damages, he "must also show intentional discrimination under a deliberate indifference standard." *Durham*, 2023 WL 6108591, at *4. Again, Graziano's allegations are minimally sufficient to support that prison officials knew of his protected right under the ADA but nevertheless failed to act on any of his requests. *See id.* (Plaintiff's allegations that "[h]e made numerous prison officials aware that he had a cane, needed a cane to walk, and was in severe pain without it," and "[d]espite this, he was continuously denied his cane and shower accommodations," sufficiently pled intentional discrimination).

### 2. Sovereign immunity does not bar Graziano's request for money damages based on the allegations of the Complaint.

Turning to the second step of the *Bowers* analysis, the Court also finds the facts minimally sufficient to implicate a potential Fourteenth Amendment violation. The United States Supreme Court has held that the "refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs ... independently violate[s] the provisions of § 1 of the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. at 157. Graziano's allegation that the DOC's refusal to accommodate his disability by adjusting when his medication was to be dispensed prevented him from participating in meals, recreational programs, and other services, if substantiated through discovery, may rise to the level of a constitutional injury for purposes of the *Bowers* abrogation analysis.[22]

---

[22] Although the Court has found these allegations insufficient to state an Eighth Amendment claim against Adams, Smith, and Oberlander in their individual capacities, it appears they may nevertheless support a Fourteenth Amendment violation against the DOC for purposes of the *Bowers* analysis. *See United States v. Georgia*, 546 U.S. at 157.

Accordingly, the Court must deny the motion to dismiss Graziano's Title II ADA claim. The DOC may renew its challenge to the various elements of this claim and the reasonableness of Graziano's requested accommodations at the summary judgment stage of the case when the Court has the benefit of a more complete record.

### I. State Law Claims

Graziano asserts Pennsylvania state law claims of IIED (Count XIX) and NIED (Count XX) against all Defendants, as well as assault and battery (Count VIII) and false imprisonment (Count XII) claims against certain DOC Defendants.[23]  The Centurion Defendants argue that the Complaint fails to state viable IIED and NIED claims.  DOC Defendants submit that sovereign immunity bars the state law claims against them.  The Court will address these arguments in turn.

### 1.    Counts XII and XX fail to state an IIED or NIED claim against any Defendant.

To state a claim for IIED, Graziano must allege facts to show that the Defendants' conduct was "(1) extreme and outrageous, (2) intentional or reckless, and (3) caused severe emotional distress." *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 541 (M.D. Pa. 2009) (citing *Livingston v. Borough of Edgewood*, 2008 WL 5101478 at *6 (W.D.Pa.2008) (citing *Hargraves v. City of Philadelphia*, 2007 WL 1276937 (E.D.Pa. April 26, 2007)). Pennsylvania courts have defined "extreme and outrageous conduct" as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting *Hoy v.*

---

[23] Count VIII asserts a state law assault and battery claim against Lt. Haggerty, Lt. Deal, Lt. Dickey, CERT Officers #1-6, and Supt. Oberlander.  The false imprisonment claim against UM Crowther, CO1 Morgan, HEX Fiscus, Supt. Oberlander, DSCS Adams, DSFM Mongelluzzo, CCPM Gustafson, Lt. Bogardus, and CO1 Minich was dismissed, *supra.*

*Angelone*, 554 Pa. 134, 720 A.2d 745, 754 (1998) (citing *Buczek v. First Nat'l Bank of Mifflintown*, 366 Pa. Super. 551, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).  Graziano contends that every Defendant "engaged in extreme and outrageous conduct that intentionally and recklessly caused [Graziano] severe emotional distress." *Id.*, ¶ 492.  This bald allegation, even when viewed in the totality of Graziano's factual allegations. fails to support an IIED claim against any Defendant.  None of the conduct alleged in the Complaint rises to the level of extreme or outrageous conduct under Pennsylvania law.

The NEID claim fares no better.  Under Pennsylvania law, a negligent infliction of emotional distress claim is cognizable in four scenarios: "(1) the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger and reasonably feared impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." *Cohen v. Johnson & Johnson*, 634 F. Supp. 3d 216, 240 (W.D. Pa. 2022) (quoting *Runner v. C.R. Bard*, 108 F. Supp. 3d 261, 272 (E.D. Pa. 2015)).  "A plaintiff must also establish the elements of a negligence claim, i.e., that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Id.* (quoting *Wilder v. United States*, 230 F. Supp. 2d 648, 654 (E.D. Pa. 2002)).  In support of his NIED claim, Graziano merely states that Defendants "acted negligently," and their negligence caused him to "suffer[] injuries and damages . . . including severe emotional distress." *Id.*, ¶¶ 495, 496.  This conclusory allegation does not suffice to demonstrate any of the elements of an NIED claim.  Accordingly, the Court will dismiss both the IIED claim and the NIED claim.

### 2.    The Complaint fails to allege facts to support a state law false imprisonment claim.

Graziano asserts a false imprisonment claim under Pennsylvania law against certain DOC

Defendants for "subjecting [him] to solitary confinement." ECF No. 11, ¶ 466. Such a claim

requires a plaintiff to allege facts to demonstrate:

> 1) defendant detained her; and 2) the detention was unlawful.
> *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994)).
> More specifically, liability for false imprisonment attaches where:
> (a) one acts intending to confine another within boundaries fixed
> by the actor, (b) his act results in such a confinement of the other,
> and (c) the other is conscious of the confinement or is harmed by
> it.

*Kintzel v. Kleeman*, 965 F. Supp. 2d 601, 608 (M.D. Pa. 2013) (citing *Gagliardi v. Lynn*, 285

A.2d 109, 111 n.2 (1971)). Graziano has alleged no facts to support that his confinement in the

RHU was unlawful. This claim fails as a matter of law.

### 3.    The Complaint alleges facts sufficient to state an assault and battery claim against Lt. Haggerty, Lt. Deal, Lt. Dickey, CERT Officers #1-6, and Supt. Oberlander.

Lastly, Graziano claims that the force utilized by Haggerty, Deal, Dickey, Oberlander,

and CERT Officers #1-6 against him on April 18, 2019, constituted an assault and battery

pursuant to Pennsylvania law. "Under Pennsylvania law, an assault occurs when one acts with

the intent to place another in reasonable and immediate apprehension of harmful or offensive

contact, and that act does cause such apprehension. A battery is an intentional offensive bodily

contact." *Zimmerman v. Schaeffer*, 654 F. Supp. 2d 226, 255 (M.D. Pa. Aug. 17, 2009).

Graziano alleges that on the evening of April 18, 2019, Defendants "pepper sprayed [him]

knowing he had asthma and bashed his hand while they the [sic] took off his handcuffs then left

him in pain and suffering in a cold and empty cell without need or provocation." ECF No. 11, ¶

452. These allegations state a claim of assault and battery.

DOC Defendants do not dispute the assault and battery claim for purposes of the motion to dismiss, but they do posit that they are immune from the state law claims under the doctrine of sovereign immunity.  Defendants are correct that, as DOC employees, they are entitled to immunity for intentional tort claims so long as the tortious conduct was committed within the scope of their employment. *See, e.g., Brown v. Smith*, 2019 WL 2411749, at *4 (W.D. Pa. June 7, 2019) (noting that assault and battery do not fall within the nine statutory exceptions to immunity listed in § 8522). *See* 42 Pa.C.S. § 8522(b).[24]  However, courts in this Circuit have held "that intentionally tortious conduct which is 'unprovoked, unnecessary, or unjustified by security concerns or penological goals' does not fall within the scope of employment for purposes of sovereign immunity." *Graham v. Pennsylvania Dep't of Corr.*, 2022 WL 2874724, at *9 (W.D. Pa. Mar. 21, 2022), *report and recommendation adopted*, 2022 WL 2871331 (W.D. Pa. July 21, 2022) (quoting *Fennell v. Wetzel*, 2019 WL 1264898, at *11 (M.D. Pa. Jan. 18, 2019) (citing *Wesley v. Hollis*, 2007 WL 1655483, at *15 (E.D. Pa. June 6, 2007))).  *See R.B. Hollibaugh*, 2017 WL 663735, at *16 (M.D. Pa. Feb. 1, 2017), *report & recommendation adopted*, 2017 WL 661577 (M.D. Pa. Feb. 17, 2017) (several correctional officers denied sovereign immunity when they allegedly physically assaulted the plaintiff based on racial animus); *Savage v. Judge*, 2007 WL 29283, at *5 (E.D. Pa. Jan. 2, 2007) (correctional officer not entitled to sovereign immunity on allegation that he assaulted an inmate to prevent him from testifying in a case against multiple correctional officers); *Velykis v. Shannon*, 2006 WL 3098025, at *3-4 (M.D. Pa. Oct. 30, 2006) (correctional officer not entitled to sovereign immunity when he allegedly slammed the door of a transport van shut on the plaintiff's head).

---

[24] The General Assembly has waived immunity in cases of: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa. C.S.A. § 8522.

In this case, the record is not sufficiently developed to determine whether Haggerty, Deal, Dickey, Oberlander, and CERT Officers # 1-6 alleged use of force on the evening of April 18, 2019, fell within the scope of their employment.   Accordingly, this claim will proceed to discovery.   Defendants are, however, immune from the IIED, NIED, and false imprisonment claims, and so these claims are dismissed with prejudice.

### J.  Leave to Amend

The Third Circuit has instructed that if a civil rights complaint is vulnerable to dismissal for failure to state a claim, the Court should permit a curative amendment unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).  The Court may deny leave to amend where there is "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).   And though "the grant or denial of an opportunity to amend is within the discretion of the District Court," it may not "outright refus[e] to grant the leave without any justifying reason appearing for the denial." *Id.* These instructions are equally applicable to *pro se* litigants and those represented by counsel. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).

In this case, Graziano has submitted a factually exhaustive Complaint that reveals that certain of his claims are simply precluded by governing law (e.g., Fourth Amendment claims, false imprisonment claim).  Furthermore, the factual allegations of the Complaint negate many of his claims (e.g., conditions of confinement claims, his deliberate indifference to serious medical needs claim, his access to courts claims, due process claims, conspiracy claims, retaliation claims, IIED and NIED claims).  Therefore, the Court finds that it would be futile to allow

Graziano to file an amended complaint with respect to these and the other claims dismissed herein and will dismiss these claims *with prejudice.*

## VI.   Conclusion

For the foregoing reasons, the Court GRANTS the Centurion Defendants' motion to dismiss (ECF No. 70) and GRANTS in part and DENIES in part DOC Defendants' motion to dismiss (ECF No. 60).  Pursuant to the motions and the Court's screening authority under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), the following claims are dismissed with prejudice: Count I, Count II, Count III, Count IV, Count V (as to the Eighth and Fourteenth Amendment claims), Count IX, Count X, Count XI, Count XII, Count XIII (against Defendants Perrin, Adams, Mongelluzzo, Gustafson, and Biel only), Count XIV (against Defendants Perrin, Adams, Mongelluzzo, Gustafson, and Biel only), Count XV, Count XVII, Count XVIII, Count XIX, and Count XX.  The DOC Defendants' motion is DENIED as to Counts V (as to Title II ADA claim only), VIII, XIII (against Defendant Oberlander only), and XIV (against Defendant Oberlander only).

DATED this 30th day of September, 2023.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE