IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

| | |
|---|---|
| EDWARD GRAZIANO, | ) |
| | ) |
| Plaintiff | ) 1:22-CV-00163-RAL |
| | ) |
| vs. | ) RICHARD A. LANZILLO |
| | ) Chief United States Magistrate Judge |
| PENNSYLVANIA DEPARTMENT OF | ) |
| CORRECTIONS, LT. DEAL, LT. | ) MEMORANDUM OPINION ON |
| HAGGERTY, DERECK F. | ) DEFENDANTS' MOTION FOR |
| OBERLANDER, LT. DICKEY, C/O | ) SUMMARY JUDGMENT |
| DALE BARGER, C/O JUSTIN | ) |
| HOLLAND, C/O GARY HILER, C/O | ) |
| JEREMY SHELLEY, C/O JOE | ) RE: ECF NO. 203 |
| SIBBLE, C/O NATHAN PERKINS, | ) |
| | ) |
| Defendants | ) |

Plaintiff Edward Graziano ("Graziano") commenced this pro se action against

thirty-six defendants. The Pennsylvania Department of Corrections ("DOC") and ten

employees of the DOC at its State Correctional Institution in Forest County ("SCI-

Forest") remain as Defendants following the Court's disposition of prior motions to

dismiss.[1] Nine remaining Defendants are corrections officers of varying rank: Lt.

Deal, Lt. Dickey, Lt. Haggerty, CO Dale Barger, CO Gary Hiler, CO Justin Holland,

CO Nathan Perkins, Jeremy Shelly, and CO Joe Sibble. The other individual

Defendant is Derek Oberlander, the former Deputy Superintendent of Central

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge as authorized by 28 U.S.C. § 636. The Court previously dismissed the claims against Defendants Bogardus, Brian Byers, Richard Camacho, Criley, Michelle Crowther, Lisa Fiscus, Angel F. Gressel, Ian Gusstafson, Erin Miller, Gregory Miller, Ross Miller, Minich, Earnest Mongelluzzo, Morgan, Yvette Perrin, Lisa Reeher, Bruce Simons, Kimberly Smith, Witness of DC-141, Part D2, Susan R. Adams, Theresa Biel, Centurion, Kevin Cowan, Wellpath, LLC., and Andrew Leslie. *See* ECF Nos. 106, 276.

Services at SCI-Forest. Following the Court's orders on prior motions to dismiss (*see* ECF Nos. 106, 276), the following claims remain:

(1)     Count V: an American Disabilities Act ("ADA") claim against the DOC;

(2)     Count VI: an Eighth Amendment excessive force claim against Defendants Haggerty, Deal, Hiler, Barger, Shelley, Sibble, Perkins, and Holland (collectively "Corrections Officer Defendants"), and a related supervisory liability claim against Defendants Oberlander and Dickey;

(3)     Count VIII: a state law assault and battery claim against the Corrections Officer Defendants; and

(4)     Counts XIII and XIV: First Amendment claims against Oberlander.

Discovery has concluded and the Defendants have moved for summary judgment. For the reasons discussed herein, the Defendants' motion will be denied as to Graziano's ADA claim and granted as to all other claims.

I.     Material Facts[2]

A. ADA Claim

At all times relevant to this action, Graziano was an inmate at SCI-Forest.[3] Graziano has been diagnosed with antisocial personality disorder, anxiety, and depression and has been prescribed psychiatric medications for his mental health conditions and related sleep difficulties. *See* ECF No. 205, ¶ 5; ECF No. 276 ¶ 5; ECF No. 281 ¶ 6. Graziano received his psychiatric medications during "medline" or "med pass." The Defendants assert that this occurred at approximately 3:30 p.m. to 4:30

---

[2] The material facts are taken from the parties' concise statements of material facts (ECF Nos. 205, 279), as well as the appendixes and exhibits submitted by the Defendants and Graziano (ECF Nos. 206, 210, 277, 281). Disputed facts are noted.

[3] Graziano remains in the custody of the DOC but is currently housed at SCI-Benner Township.

p.m. while Graziano states that medline was conducted between 4:30 p.m. to 5:30 p.m. ECF No. 281 ¶ 6. On June 30, 2019, Graziano completed an "Inmate Disability Accommodation Request Form" in which he complained that cell lighting, the cell intercom, and early medline distribution disrupted his sleep, resulting in his inability to participate in certain prison programs and services. As accommodations, Graziano requested that cell security lights be turned off immediately after count, cell intercoms be used only for individualized notifications and medical emergencies, general announcements be made only over the unit loudspeaker, and evening medline be moved to a later time. Graziano alternatively requested that he be housed in SCI-Forest's Special Needs Unit which would enable him to receive his medications later in the evening or that he be transferred to another State Correctional Institution. *Id.* ¶ 8.

Kim Smith, SCI-Forest's Corrections Health Care Administrator, reviewed Graziano's request for accommodations and his medical records. She concluded that insomnia was not Graziano's diagnosed disability, but a symptom.[4] She also found that a medical or psychiatric transfer to another State Correctional Institution was not warranted because Graziano was receiving appropriate services through psychology and psychiatry.[5] Graziano asserts that he was not given his psychiatric

---

[4] Prison officials offered to move Graziano's prescription of Cymbalta to the morning to help with his complaints of insomnia, but Graziano refused. ECF No. 206-2, p. 1

[5] Graziano's alternative request to be placed in the SNU was rejected because he did not meet the criteria for SNU placement. *See* ECF No. 206-2, p.69. Prison officials rejected this placement based on their assessment that it would "not only further engrain inmate's feeling of entitlement but also create a security risk for an inmate with a known track record of escape attempts." *Id.*, p. 80. They also assessed that the "inmate is attempting secondary gain of SNU placement for female staff

3

medications at bedtime as prescribed and was subject to disciplinary action for behavior deriving from his mental health disability.  ECF No. 277-5, pp. 18-19.

After Superintendent Oberlander reviewed CHCA Smith's memorandum regarding Graziano's accommodation requests, Graziano's Inmate Disability Accommodation Request Form and Smith's recommendation were forwarded to the Central Office Inmate Disability Accommodation Committee ("COIDAC") for a final decision.  COIDAC determined that Graziano was being reasonably accommodated because he was prescribed medication to treat his mental health diagnoses and therefore denied his request for further accommodations.[6]  Graziano disputes COIDAC's finding.  He asserts that requiring him to take his "psychiatric medications so early rendered the medication ineffective at helping me manage my anxiety and depressive disorders and regulate [his] sleep…which substantially impaired my brain and physical functioning which deprived me of the benefits of and from participating in, the services, programs and activities that SCI-Forest provided to qualified individuals like myself …".  ECF No. 281, ¶ 20.

B.  The April 18, 2019 Use of Force Incident

On April 17, 2019, Graziano was placed in Psychiatric Observation Cell ("POC") 3D-1004 after expressing suicidal ideation.  On April 18, 2019, medical staff

---

contact…he has a history of exposing himself and for sexual harassment towards female staff members." *Id*. p. 92.

[6] On November 26, 2019, Graziano filed Grievance Number 836921 complaining of the conditions of his confinement and reasserting that his sleep was being disrupted by the lights on his housing unit, the use of the intercom system by corrections staff, and the timing of medline.  While this grievance did not specifically challenge the denial of Graziano's request for accommodations, it referenced Grievance Number 838427, which did.

cleared Graziano to be moved from the POC back to a cell in the Restricted Housing Unit ("RHU").[7]  Graziano refused to comply with the transfer order.  Defendant Lieutenant Haggerty was called to Graziano's POC cell to attempt to gain his compliance, and when this was unsuccessful, a seven-man compliance team was assembled to remove Graziano from the POC and transfer him to a cell in the RHU. The team consisted of Lieutenant Deal, as the commissioned officer in charge, and Corrections Officers Perkins, Holland, Shelley, Sibble, Barger, and Hiler.

Defendant Perkins was assigned to hold the Electric Body Immobilization Device ("EBID"), Defendant Holland was assigned to carry and operate the gel oleoresin capsicum ("OC") spray, Defendant Shelley was assigned to carry the handheld electromuscular incapacitation device ("EID"), Defendant Sibble was assigned to carry and control the handcuffs, Defendant Barger was assigned to operate the handheld video camera, and Defendant Hiler was assigned to be in charge of leg shackles.[8]  The compliance team assembled for a briefing and proceeded to

---

[7] In support of this fact, the Defendants produced multiple exhibits, including an Enhanced Mental Health Questionnaire dated April 18, 2019, at 20:46:39, noting under "Comment on POC Admissions": "Inmate in POC for one day, released today, refusing to move to RHU, doctor called and states alright to move inmate." ECF No. 206-2, p. 87.  Graziano disputes that he was cleared by medical personnel to be transferred to the RHU, but he provides no evidence for his position other than his Complaint (ECF No. 11) and Supplemental Complaint (ECF No. 139). He therefore has failed to create a genuine dispute regarding the Defendants' assertion of fact. *See Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

[8] Graziano disputes that the handheld recording of the incident on April 18, 2019, was taken by Defendant Barger or that the video is genuine and unaltered, asserting that no expert has examined the video.  The recording itself, however, reflects that at the conclusion of the incident and debriefing, Defendant Deal asked Defendant Barger whether "the camera was on the entire time," to which Barger responded in the affirmative.  ECF No. 210, Exhibit Q, at 23:23.  Courts applying Federal Rule of Evidence 901 do not require technical proof negating the possibility of editing where a video is supported by testimony that it fairly and accurately depicts the events at issue and where the recording itself reflects a continuous, uninterrupted sequence with no apparent gaps or alterations.

Graziano's POC cell.  When the compliance team arrived at the cell, Graziano was standing on his desk.  Deal spoke with Graziano and gave him several warnings and orders to come down from the desk to be escorted to the RHU.  He warned Graziano that OC spray would be deployed if he did not comply.  Despite this warning, Graziano refused to comply, and Defendant Holland on Deal's orders sprayed OC spray through the cell door aperture.  After several more orders are issued, Graziano came to the door to be handcuffed for escort to the RHU.  A nurse met with Graziano in the hall after he was removed from the POC cell, flushed his eyes, and photographed his condition.

Graziano was then escorted to the RHU and placed in RHU cell JD1008. Defendant Sibble secured the cell door and removed Graziano's handcuffs through the cell door aperture.  Graziano then walked away from the door with his hands at his sides with his back to the cell door.  The members of the compliance team then attempted to exchange Graziano's smock for clean clothes, but Graziano refused to cooperate and swore at the officers.  Barger remained cell-side with the camera for

---

*See, e.g., United States v. Browne,* 834 F.3d 403, 413–14 (3d Cir. 2016); *cf. United States v. Stephens,* 202 F. Supp. 2d 1361, 1367 (N.D. Ga. 2002). This burden may be satisfied through a sworn declaration of a witness with personal knowledge attesting to the recording's accuracy and completeness. *See Fed. R. Evid.* 901(b)(1); *United States v. Reilly,* 33 F.3d 1396, 1404–05 (3d Cir. 1994) (authentication satisfied through testimony of a witness with knowledge that evidence is what it purports to be). Here, Defendant Barger submitted a sworn declaration stating: "I captured all [compliance team assembly, interaction with Graziano, and use-of-force debriefing on April 18, 2019] on handheld video camera... the camera was on for the entire incident and at no time did it become non-operational." ECF No. 206-15. This testimony, combined with the video's depiction of a single continuous interaction from beginning to end with no apparent interruptions, is sufficient to authenticate the recording for purposes of Rule 901. *See also Martin v. Wetzel,* 2024 WL 2926005 (W.D. Pa. 2021) (considering continuous handheld prison video footage as part of the evidentiary record).

approximately three more minutes, during which Graziano's hands did not appear to be bleeding or visibly injured. Medical staff later reported to Graziano's RHU cell.[9]

### C. Removal of Privileges regarding Jacqueline DiNardi.

In October 2000, during a cell search of Graziano's cell at the State Correctional Institution at Rockview ("SCI-Rockview"), a hidden compartment under the toilet pedestal was discovered. The pedestal had been hollowed out and a door fashioned to match the surrounding area and conceal the compartment. Among other items, two cell phones registered to Graziano's girlfriend, Jacqueline DiNardi, were discovered in the hidden compartment.[10] Graziano was charged with seven counts of Possession of Weapons or Implement for Escape in violation of 18 Pa. C.S.A. § 5122(a)(1). Jacqueline DiNardi was not removed from Graziano's visitor and phone list at the time of this incident in 2000. In March 2021, Defendant Oberlander was made aware of the above incident and the fact that while Graziano was housed at SCI-Rockview, he had been found in possession of two cell phones that were in DiNardi's name. Oberlander directed removal of DiNardi from Graziano's visitor list, despite the passage of time since the infraction, because he considered her to remain a significant security risk and she should have been removed immediately when the

---

[9] On April 22, 2019, Graziano filed Grievance Number 798113 regarding the April 18, 2019 incident. Defendant Dickey investigated Grievance No. 798113 and concluded that Graziano's allegations of abuse were unfounded. Dickey's investigative findings were reviewed by the Bureau of Investigations and Intelligence ("BII"), which concurred with Dickey's findings and conclusion. The Secretary's Office of Inmate Grievances and Appeals ("SOIGA") upheld the denial of Graziano's Grievance No. 798113 on final appeal. SOIGA's final appeal decision was issued on May 18, 2020. Graziano disputes that he received a copy of SOIGA's final appeal decision. ECF No. 279, ¶ 48.

[10] Graziano disputes that the affidavit of probable cause alleged that the two cellular telephones were registered to Jacqueline DiNardi. See ECF No. 279 ¶ 50. However, the affidavit of probable cause for Police Criminal Complaint Docket Number CR-151-01 expressly stated: "The phones were in the name of Jacqueline DINARDI, who is listed as GRAZIANO's girlfriend." ECF No. 206-22 at 3.

7

incident in 2000 occurred.[11]    On March 18, 2021, a letter was sent to DiNardi informing her of the termination of her visitation privileges with Graziano.  DiNardi subsequently appealed this decision in a letter dated May 1, 2021.  On May 24, 2021, DiNardi was notified that her visitation privileges were reinstated but would be restricted to virtual visits only.  DiNardi communicated with Theresa Biel and other DOC employees regarding visitation and Graziano's mental health status in December 2020 and March 2021.

II.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure requires the district court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome under applicable substantive law.  *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Brenner v. Loc.*

---

[11] Graziano asserts that it is unclear who notified Oberlander of the incident involving the two cellular devices registered in DiNardi's name. ECF No. 205 ¶ 53.  To the extent this constitutes a dispute of fact, it is immaterial.  Regardless of how Oberlander became aware of the incident, he removed DiNardi from Graziano's phone and visiting list upon learning of the incident.  In his sworn declaration, Oberlander noted that the fact that DiNardi was not removed at the time of the incident was essentially "an accident."  ECF No. 206-4 at 5.

*514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record in a light most favorable to the nonmoving party. *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond its pleadings with affidavits, depositions, answers to interrogatories, or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). On a motion for summary judgment, "a pro se plaintiff is not relieved of his obligation under [Federal Rule of Civil Procedure] 56 to point to competent evidence in the record that is capable of refuting a defendant's motion ...." *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (citation omitted).

III.   Discussion

    A. Defendants have not demonstrated Graziano's failure to exhaust his administrative remedies regarding his ADA accommodation claim.

Defendants assert that they are entitled to summary judgment on Graziano's ADA claim because he failed to exhaust his administrative remedies as to that claim. A plaintiff's failure to exhaust prison administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e, is an affirmative defense that a defendant must plead and prove. *See Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

When properly raised by a defendant, exhaustion constitutes a threshold issue the Court must address before reaching the merits of the case. *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018). To establish this defense at the summary judgment stage, the moving party must produce a record demonstrating his entitlement to judgment on the defense as a matter of law. Fed. R. Civ. P. 56(c)(1)(A). Often, the most efficacious means to do so is for the defendant to produce the plaintiff's entire grievance record. *See, e.g., Jackson v. Superintendent Greene SCI*, 671 Fed. Appx. 23, 24 (3d Cir. 2016). Where the plaintiff omits a step in the grievance process, however, the defendant should provide an affidavit from a person with knowledge or a properly authenticated business record affirming factually that the plaintiff failed to properly exhaust. *See* Fed. R. Civ. Pro. 56(c)(4). This is often an affidavit from a records custodian. *See Muhammad v. Sec'y Pa. Dep't of Corrs.*, 621 Fed. Appx. 725, 727 (3d Cir. 2015) (affidavit attesting plaintiff failed to appeal to SOIGA); accord *Martin v. Pa. Dep't of Corrs.*, 395 Fed. Appx. 885, 886 (3d Cir. 2010) (affidavit stating plaintiff "never sought final review").

To properly exhaust a claim under the ADA, a plaintiff in the custody of the DOC must comply with the procedures set out in two policies: DC-ADM 006 "Reasonable Accommodations for Inmates with Disabilities," and DC-ADM 004 "Inmate Grievances. *See* Reasonable Accommodations for Inmate with Disabilities Procedures Manual, DC-ADM 006, Section 2(B)(4) ("An inmate who is dissatisfied with the COIDAC's determination may submit a grievance under Department policy

DC-ADM 804, 'Inmate Grievance System'").[12]  The Defendants concede that Graziano properly pursued an accommodation under DC-ADM 006 and that he did not receive notice of the COIDAC's determination until late November 2019.  They contend, however, that Graziano failed to grieve this denial under DC-ADM 004.  In support, the Defendants have produced the complete grievance history for Grievance No. 836921,[13] wherein Graziano complained of sleep deprivation due to the cell lighting, cell intercom system, and early medline distribution, but he omitted any specific reference to the COIDAC's denial of accommodations.

In response to this assertion, Graziano has produced Grievance No. 838427, which does refer to the COIDAC's determination.  *See* ECF No. 277-1, pp. 23-30.  This grievance challenged two matters: (1) his delayed notice of the COIDAC's determination, and (2) COIDAC's final determination that he was not entitled to accommodations for his sleep disorder.  *Id*. p. 23.  The Initial Review Response asserted that it was improper to grieve both in the same grievance; however, the initial reviewing officer went on to address both issues.  *Id*. p. 25.  The Facility Manager upheld the Initial Review Response's denial of Grievance No. 838427 as to Graziano's request for accommodations.  *Id*. p. 27.  Finally, SOIGA denied Graziano's

---

[12] DC ADM-804 requires inmates to satisfy a three-step grievance and appeals process.  First, the inmate must legibly set forth all facts and identify all persons relevant to his claim in a grievance which will then be subject to "initial review."  *See* Grievance System Policy DC ADM-804.  Second, the initial review must be appealed to the Facility Administrator for a second level of review.  *Id*.  Finally, the inmate must file an appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA").  *Id*.  All three stages of review must be completed before a grievance is deemed administratively exhausted for purposes of the PLRA.

[13] The Defendants included the complete grievance history for only one other grievance, Grievance No. 798113, in relation to Graziano's claim for use of excessive force stemming from the April 18, 2019 incident.  *See* ECF No. 206-20.

appeal, finding the grievance and appeal related to Graziano's untimely receipt of the COIDAC's determination caused Graziano no apparent harm from this delay. *Id.* p. 30. Although the grievance record is somewhat confused, the Court finds that Graziano raised the grounds for his ADA claim in Grievance No. 838427 and properly appealed its denial through all steps required under DC-ADM 804. The Defendants have therefore failed to meet their burden to establish their exhaustion defense.

B. Graziano's ADA claim is not barred by the statute of limitations.

The Defendants next argue that Graziano's ADA claim is barred by the applicable statute of limitations. *See* ECF No. 204, pp. 8-10. The Court disagrees. Claims under Title II of the ADA are governed by the forum state's analogous statute of limitations, which in Pennsylvania is its statute of limitations for personal injury claims. *See Freed v. Consolidated Rail Corp.*, 201 F.3d 188 (3d Cir.2000); *Saylor v. Ridge*, 989 F. Supp. 680, 685–86 (E.D.Pa.1998). Pennsylvania's limitations period for such claims is two years. 42 Pa. Cons. Stat. Ann. § 5524. The date of accrual of a federal claim is the date "when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Toney v. U.S. Healthcare, Inc.*, 840 F. Supp. 357, 359 (E.D. Pa. 1993) (citation omitted). Accepting Graziano's assertion that he was not notified of COIDAC's denial of his request for accommodation until November 2019, the Defendants argue that the statute of limitations on his ADA claim expired in November 2021. They further argue that because Graziano did not commence this action until April 12, 2022, at the earliest, his claim is barred. ECF No. 204, p. 10 (citing ECF 11-1, at 15). However, "Pennsylvania's statute of limitations is tolled while a prisoner exhausts administrative remedies" as required by the PLRA.

12

*Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015). *See also, Callahan v. Clark*, 2023 WL 5596269, at *10 (W.D. Pa. Aug. 14, 2023) (discussing when PLRA tolling commences), *report and recommendation adopted*, 2023 WL 5580998 (W.D. Pa. Aug. 29, 2023). As discussed above, Graziano exhausted his administrative remedies for his ADA claim. The administrative process was not completed until May 18, 2020, when SOIGA issued its final decision. Because Graziano filed this action on April 12, 2022, less than two years after SOIGA's final decision, his ADA claim was timely filed.

> C. The DOC is not entitled to summary judgment on the merits of Graziano's ADA claim.

Title II of the ADA prohibits a public entity from discriminating against disabled individuals by denying them equal access to services, programs, or activities. 42 U.S.C. §§ 12131–12132. "State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)).

To succeed on a Title II claim, the plaintiff "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Haberle v. Troxell*, 885 F.3d 170, 178-79 (3d Cir. 2018); *see also Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 527 (3d Cir. 2024). When seeking compensatory

damages, the plaintiff must also demonstrate intentional discrimination under a deliberate indifference standard. *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023).

Graziano has satisfied the first two elements of a Title II claim. He is a qualified individual with a disability. "'[M]ental illness qualifies as a disability under' the ADA." *Williams*, 117 F.4th at 528 (alteration in original) (quoting *Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015)) (citing 28 C.F.R. § 35.108(d)(2)(iii)). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The Defendants do not dispute that Graziano was qualified to participate in the prison's programs and services.

In addition to demonstrating that he was qualified to participate in the programs and services offered, the plaintiff must also prove that he was excluded from them by reason of his disability. *See Wareham v. Penn. Dep't. of Corr.*, 2014 WL 3529996, at *11-12 (W.D. Pa. July 15, 2014) (inmate's allegation that he missed "some meals and some yard-outs that he would have went to" had he been offered reasonable accommodations for his mobility impairments was sufficient to state an ADA violation); *Durham*, 82 F.4th at 226 ("Refusing to make reasonable accommodations is tantamount to denying access.") (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667,

672 (7th Cir. 2012)). While the record is thin regarding the programs or services Graziano claims he was excluded from, or denied the benefits of, the Defendants have not specifically challenged this element of the claim. And Graziano does assert that the prison's failure to provide his medication schedule accommodation impaired his ability to participate in a prison computer course. *See* ECF No. 280, pp. 9-10; ECF No. 277-3, p. 37 ("I was enrolled in a computer class facilitated by Ms. Morgan before the pandemic, and had to drop out because I could not maintain focus or fight of drowsiness that frequently and suddenly as times, subdues me."). "[T]he demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003).

The Defendants' primary argument is that the prison provided Graziano with reasonable accommodations of his mental illnesses, including sleep hygiene education and other mental health services, but he declined or refused to participate in these services. *See* ECF No. 204, p. 13. They further argue that Graziano "was not precluded from any program, service, or activity by reason of his disability, [but he] simply refused to take advantage of the reasonable and effective options that were available to him." ECF No. 204, p. 13; *see also* ECF No. 277-2, pp. 31, 43. It is true that the ADA requires only reasonable accommodation, not the accommodation of the plaintiff's choice. *See Baxter v. Pennsylvania Dep't of Corr.*, 661 Fed. Appx. 754, 755–56 (3d Cir. 2016). But the accommodations provided by a prison are "reasonable" only

if they "give a disabled prisoner 'meaningful access' to the prison program in question." *Defreitas v. Montgomery County Correctional Facility*, 525 Fed. Appx. 170, 178 n. 14 (3d Cir. 2013) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Here, the Defendants assert that Graziano's own noncompliance was the source of any limited access to services or programs he encountered. Indeed, Graziano's medical records include references to Graziano declining certain medication changes and his resistance to certain services. *See* ECF No. 206-2, pp. 1, 24, 28, 42. But the Defendants did not raise such matters in their Concise Statement of Material Facts, and by failing to do so, they did not give Graziano a meaningful opportunity to respond to their assertions. Furthermore, the limited and often cryptic references included in Graziano's voluminous medical records, standing alone, do not establish the reasonableness of the accommodations offered to Graziano or his non-compliance with them. The Defendants have thus failed to demonstrate the absence of genuine issues of material fact concerning the reasonableness of the accommodations offered by the prison. And, for his part, Graziano asserts that the accommodations offered to him were ineffective to relieve the insomnia that attended his mental health disability. And he further asserts that the prison's refusal to accommodate his disability by adjusting when Graziano's mental health medications were dispensed exacerbated his condition and effectively precluded his participation in programs and services available to nondisabled inmates.[14]

---

[14] The Defendants do not assert, and the record does not support, that the prison's refusal to adjust the timing of Graziano's medications was driven by medical considerations. If such were the case, this decision might fall outside the scope of the ADA. *See Isley v. Beard*, 200 Fed. Appx. 137, 142 (3d Cir. 2006); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) ("[P]urely medical

16

Whether the accommodations requested by a disabled inmate are reasonable is a fact-specific inquiry. *See, e.g., Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact ..."); *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (under the ADA, "a determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry"). Based on the current record, the Court cannot find as a matter of law that the accommodations offered or provided by the prison were reasonable or, conversely, that the adjustment to the medication schedule requested by Graziano was not reasonable and necessary to provide him the access to prison programs and services available to nondisabled inmates.[15] The Court will therefore deny the Defendants' motion for summary judgment as to Graziano's ADA claim.[16]

_____

decisions ... do not ordinarily fall within the scope of the ADA or the Rehabilitation Act."); *Thomas v. Pa. Dep't of Corr.*, 615 F. Supp. 2d 411, 429 (W.D. Pa. 2009) ("plaintiff's requests for a handicap cell that were denied based on a medical determination that they were not warranted did not support discriminatory treatment in violation of Title II of the ADA").

[15] Graziano's requests for deviations from prison policies regarding lighting and intercom practices appear far more dubious, especially given the security concerns implicated by such changes.

[16] The Defendants did not raise Eleventh Amendment sovereign immunity to challenge Graziano's ADA claim. Graziano's claim against the DOC is essentially a claim against the Commonwealth of Pennsylvania. The sovereign immunity afforded by the Eleventh Amendment provides states and state agencies – including the DOC – with immunity from suit in federal court unless the immunity has been abrogated by Congress or waived by the state. *MCI Telecomm Corp. v. Bell-Atlantic-Pennsylvania*, 271 F.3d 491, 503 (3d Cir. 2001); *Lavia v. Pennsylvania, Dep't. of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (noting that, as an agency of the Commonwealth of Pennsylvania, the DOC is entitled to assert Eleventh Amendment immunity). Title II of the ADA abrogates sovereign immunity only as to state conduct that also violates the Constitution. *See United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Shaw v. Pennsylvania Dep't of Corr.*, 2018 WL 6831148, at *5 (W.D. Pa. Dec. 28, 2018). Because the Defendants did not raise sovereign immunity in their motion for summary judgment, the Court will not address whether the conduct asserted by Graziano also violates the Constitution.

.

D. Defendants Holland, Hiler, Deal, Shelley, Haggerty, Barger, Sibble, Perkins, Dickey, and Oberlander are entitled to summary judgment on Graziano's excessive force and associated supervisory liability claims.

Graziano asserts that Defendants Deal, Haggerty, Holland, Hiler, Barger, Shelley, Sibble, and Perkins used excessive force when they transferred him from a POC cell to a cell in the RHU on April 18, 2019, and that Defendants Oberlander and Dickey are liable for the corrections officers' conduct based on their supervisory roles. The "core judicial inquiry" in an excessive force claim is whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In determining whether a correctional officer's use of force was excessive and violative of the Eighth Amendment, a court should consider: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312 (1986)).

Where the use of force at issue has been captured on video, the court must consider that evidence in determining whether any genuine issue of material fact remains regarding the incident. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). The court must view the facts as depicted in the video. *See id.* (holding that on summary judgment, the lower court "should have viewed the facts in the light depicted by the

videotape"). Additionally, "where there are video recordings of the incident in question, [the court] need not adopt the non-movant's version of the facts if the recording 'blatantly contradict[s]' the non-movant's version 'so that no reasonable jury could believe it.'" *McDowell v. Sheerer*, 374 Fed. Appx. 288, 291-92 (3d Cir. 2010) *quoting Scott*, 550 U.S. at 380. If a review of the video "refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate." *Smalls v. Sassaman*, 2019 WL 4194211, at *8 (M.D. Pa. Sep. 4, 2019) (citing *Tindell v. Beard*, 351 Fed. Appx. 591 (3d Cir. 2009)).

The Corrections Officer Defendants did not assemble to remove Graziano from his POC until after he refused to comply with the order that he be transferred to a cell in the RHU and after Haggerty tried unsuccessfully to convince him to cooperate. Before the officers proceeded to Graziano's POC, Deal instructed them, "Okay, when we go in we are gonna ask the inmate, if that doesn't work we are gonna apply a burst of OC, close the piehole, let him sit for a minute or two. And then if he still doesn't comply, we are gonna apply another burst of OC. We will apply him with three bursts before we have to go in." ECF No. 210, Exhibit Q, 1:18-1:36. After the team entered the psychiatric unit, the following exchange ensued.

> Deal:      Mr. Graziano, we are here to take you down to the RHU, are you gonna come?
> Graziano: I am feeling suicidal.
> Deal:      Okay, psych has seen you, they can watch you down there. Are you gonna come down?
> Graziano: If you come in I am gonna jump down–dive head first.

Deal:       Okay, well we are not gonna come in.  If you don't come down we are gonna apply OC in there.

Graziano: I am gonna jump before you guys come in.

Deal:       Okay, so you are refusing all orders to–

Graziano: I told you, I am feeling suicidal

Deal:       Alright, did you talk to psych?

Graziano: I told them, I told them–

Deal:       Okay, did you talk to the RHNT guy?

Graziano: I don't know who that is.

Deal:       The Lieutenant. The other Lieutenant–Lieutenant Haggarty that came down here, did you talk to him?

Graziano: I told him I am suicidal.

Deal:       Okay, and what–

Graziano: You don't believe me I am gonna show you

Deal:       Okay, and what did psych tell you?

Graziano: He didn't say nothing. He said alright, the deputy said 'well you are staying here.'

Deal:       Okay, well that's changed cause you are gonna–you were cleared for the RHU.

Graziano: Nothing's changed on my side.

Deal:       Okay, I am gonna give you one more chance to come out before we apply OC.

Graziano: Alright.

*Id.,* at 1:49-2:43.

Graziano then braced himself and used his blanket to partially cover his face. Holland then administered a burst of OC spray for two seconds before Deal instructed, "that's good, that's good.  Close the pie hole." *Id.,* at 2:53-2:55.  Deal then allowed Graziano time to wash his face in the sink, while instructing him to come to the door to be handcuffed and decontaminated. *Id.,* at 3:00-4:43.  Graziano was then handcuffed and escorted from the cell with little or no force being applied.  The officers waited as Graziano put on his slide shoes before a triage nurse flushed the OC spray

from his eyes and photographed his face.  Graziano was then escorted without issue to the cell in the RHU.  Once in the cell, Graziano's handcuffs and smock were removed and he walked into the cell.  *Id.*, at 15:40-16:15.  The following exchange then occurred:

| | |
|---|---|
| Hiler: | Graziano? Graziano? You got to pass me your smock. |
| Graizano: | What? |
| Hiler: | Graziano, I need your smock.  Pass it out to me and we'll get you a jumper. |
| Deal: | Graziano.  Hey we are trying to not repeat the same stuff we just did. |
| Graziano: | [unintelligible swearing] |
| Deal: | Hand out your smock and hand out your slides.  We'll get you a jumper. |
| Hiler: | Graziano, hand out your uh– smock |
| Graziano: | Fuck you! Motherfucker! [at this point of the video, Graziano can be heard hitting the door once] Fuck you! [at this point of the video, Graziano can be heard slamming his hand into the open wicket] Fuck you! [at this point in the video Graziano walks away from the door] |
| Deal: | Secure the wicket, secure the wicket before he [unintelligible]. |

*Id.*, at 16:20-17:08.

After the wicket was closed, Graziano returned to the cell door and could be heard hitting the metal wicket three more times in rapid succession.  *Id.*, at 17:23-17:25.  The record does not support that Hiler forcefully slammed Graziano's right hand against the metal wicket in the RHU cell JD1008 as Graziano alleges.

Applied to the facts of record, the *Whitley* factors overwhelmingly support that the force used by the Corrections Officer Defendants was undertaken in a good-faith

21

effort to restore discipline and not maliciously or sadistically to cause harm. With respect to the first factor—the need for the application of force—the video shows that Graziano refused repeated orders to exit the cell and threatened to engage in self-harm if they entered. ECF No. 210, Exhibit Q, 1:49–2:43. Officers attempted to secure his compliance through verbal commands and warnings prior to any use of force, including advising Graziano that OC spray would be deployed if he did not comply. *Id.* Only after Graziano refused those directives did the officers proceed with the use of OC spray.

As to the second factor—the relationship between the need and the amount of force used—the force applied was limited and proportionate. Although officers discussed the potential use of multiple bursts of OC spray, only a single, brief two-second burst was administered. *Id.*, at 2:53–2:55. Graziano can be seen bracing himself and partially covering his face with a blanket immediately before the spray was deployed, further indicating his awareness of and continued noncompliance with the officers' directives. The restrained nature of the force used supports a finding that it was reasonably related to the need to obtain compliance without escalating the encounter.

Regarding the third factor—the extent of injury inflicted—the video does not reflect any significant or lasting injury to Graziano. Following the application of OC spray, Graziano was permitted time to rinse his face in the sink and was then escorted to a triage nurse for decontamination and photographing. *Id.*, at 3:00–4:43. The

effects observed are consistent with the temporary discomfort associated with OC spray and do not suggest excessive force.

To the extent Graziano asserts that Defendant Hiler sadistically caught his hand in the wicket, causing lacerations, the video evidence does not support that characterization. During the interaction at the RHU cell door, Graziano can be heard striking the door and placing his hand in the open wicket while refusing orders to pass out his smock. *Id.*, at 16:20–17:08. As officers moved to secure the wicket, the recording does not depict any deliberate attempt to trap Graziano's hand; rather, the sequence reflects officers responding to Graziano's continued noncompliance and securing the wicket after he stepped away from the door. Nor does the video evidence permit an inference that any contact with the wicket was inflicted maliciously or sadistically to cause harm.

The fourth factor—the extent of the threat reasonably perceived by officials— also weighs in favor of the Corrections Officer Defendants. Graziano's statements that he would "dive head first" if officers entered the cell, coupled with his refusal to comply with orders, presented a risk of self-harm that officers were required to manage. *Id.*, at 1:49–2:43. Following his transfer, Graziano engaged in additional disruptive conduct, including striking the door and slamming his hand into the wicket multiple times. *Id.*, at 16:20–17:25. Under these circumstances, it was reasonable for officers to perceive an ongoing risk requiring a controlled and measured response.

Finally, as to the fifth factor—efforts made to temper the severity of the response—the record reflects multiple such efforts directed toward Graziano.

23

Officers issued repeated verbal commands and warnings, provided Graziano with an opportunity to comply voluntarily, limited the force to a single short burst of OC spray, allowed Graziano time to decontaminate by rinsing his face, ensured that he received medical attention from a triage nurse, and escorted him without incident to the RHU. *Id.*, at 2:53–4:43. Even after placement in the RHU cell, officers again attempted to obtain Graziano's compliance through verbal instructions regarding return of his smock. *Id.*, at 15:40–16:15.

Viewing the facts in the light most favorable to Graziano and as depicted in the video, a reasonable jury could not find that the Corrections Officer Defendants acted maliciously or sadistically in their use of force. Accordingly, Defendants Deal, Haggerty, Holland, Hiler, Barger, Shelley, Sibble, and Perkins are entitled to judgment as a matter of law on Graziano's Eighth Amendment excessive force claim.

And because the Corrections Officer Defendants did not use excessive force against Graziano, his attempt to hold Defendants Oberlander and Dickey liable for their conduct based on theories of supervisory liability also fail. A claim premised on a defendant's policymaking authority or knowledge of and acquiescence in unconstitutional conduct requires proof of an underlying constitutional violation. *See Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010) (explaining that supervisor liability requires a constitutional violation); *Kopczak v. Borough of Scottdale*, 2008 WL 282337, at *7 (W.D. Pa. Jan. 31, 2008) ("Because the Court finds that there is no evidence that [a subordinate] violated Plaintiff's constitutional rights, there is no basis for supervisory liability under [42 U.S.C.] § 1983."). Here, the record

24

supports no such violation. Summary judgment in favor of Defendants Oberlander and Dickey is therefore warranted.

> E. The Defendants are entitled to immunity on Graziano's state law assault and battery claims.

Graziano has also asserted state law claims for assault and battery based on Deal, Haggerty, Holland, Hiler, Barger, Shelley, Sibble, and Perkins' use of force on April 18, 2019. As employees of the Pennsylvania Department of Corrections, these Defendants are generally immune under state law from liability for intentional tort claims, including assault and battery, unless their conduct falls outside the scope of their employment.[17] *See* 42 Pa. C.S.A. § 8522(b); *Brown v. Smith*, 2019 WL 2411749, at *4 (W.D. Pa. June 7, 2019) (noting that assault and battery do not fall within the nine statutory exceptions to immunity recognized by Pennsylvania law).

To fall within the scope of employment, an officer's conduct must (1) occur substantially within authorized time and space limits; (2) be of the kind the employee is employed to perform; and (3) where force is intentionally used, the use of force must not be unexpectable by the employer. *See Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa. Super. 1979) (quoting the Restatement (Second) of Agency § 228); *Lewald v. Pennsylvania Dep't of Corr.*, 2023 WL 8283173, at *8 (E.D. Pa. Nov. 30, 2023) (citing *Boucher v. Lupacchini*, 2021 WL 11096471, at *9 (M.D. Pa. Mar. 1, 2021)). In the prison context, courts have recognized that the use of moderate force may be a routine

---

[17] The Pennsylvania General Assembly has waived immunity in cases of: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa. C.S.A. § 8522. None of these statutory waivers applies to Graziano's assault and battery claim.

and expected part of maintaining order and discipline. *See Robus v. Pennsylvania Dep't of Corr.*, 2006 WL 2060615, at *9 (E.D. Pa. July 20, 2006). In contrast, where the force is "unprovoked, unnecessary or unjustified by security concerns or penological goals," such conduct falls outside the scope of employment, even if it occurs while the employee is on duty. *Wesley v. Hollis*, 2007 WL 1655483, at *15 (E.D. Pa. June 6, 2007).

Because the Corrections Officer Defendants' use of force on April 18, 2019, was a measured and proportionate response to Graziano's refusal to comply with orders and the risks presented by his conduct, the record provides no support for a finding that their conduct was outside the scope of their employment. They are therefore entitled to judgment as a matter of law on Graziano's state law claims.

F. Oberlander is entitled to summary judgment on Graziano's First Amendment retaliation claims.

Graziano raises two First Amendment retaliation claims against Oberlander. Both claims are based on the removal of Jacqueline DiNardi from Graziano's approved visitor and phone lists. Accordingly, the Court will analyze these counts together.

To establish a First Amendment retaliation claim, a plaintiff must show that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary

firmness" from exercising his First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). Even if Graziano proves these elements, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334.

Evidence showing that prison officials took the adverse action for legitimate, non-retaliatory factors refutes the existence of a causal link. *See Heller v. Keenhold*, 2006 WL 759647, at *7 (M.D. Pa. March 24, 2006) (granting summary judgment for the defendant on plaintiff's First Amendment retaliation claim where, among other factors, defendants presented "numerous legitimate, non-retaliatory reasons for Plaintiff's classification"); *Redman v. Walton*, 2007 WL 2406939, at * 7 (W.D. Pa. Aug.21, 2007) (concluding that prisoner failed to state a claim for First Amendment retaliation where the complaint demonstrated that the prison official had a "legitimate, non-retaliatory reason" for confining prison-plaintiff).

Graziano asserts that DiNardi was removed in retaliation for his having filed numerous grievances against various prison officials, including Oberlander, and because Graziano would relay these grievances to DiNardi through email and phone

calls. The record establishes, however, that Oberlander had legitimate penological and security reasons for removing DiNardi from Graziano's visitation and phone lists. Graziano's receipt and elaborate concealment of two cell phones registered to DiNardi constituted obvious breaches of security that necessarily involved both Graziano and DiNardi. Although the conduct occurred years earlier at a different correctional institution, its seriousness placed it well within the discretion of Oberlander to regard it as warranting the termination or limiting of Graziano's contact with DiNardi. Accordingly, Oberlander is entitled to judgment as a matter of law on Graziano's First Amendment retaliation claims.

IV.    Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment will be denied as to Graziano's ADA claim and granted as to all other claims.

An Order entering judgment for all Defendants except the DOC will issue separately.

DATED this 31st day of March 2026.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE